(No. 55329.—

MOBIL OIL CORPORATION, Appellee, v. J. THOMAS JOHNSON, Director of Revenue, *et al.*, Appellants.

*Opinion filed October 22, 1982.—Rehearing denied December 10, 1982.*

SIMON, J., and RYAN, C.J., concurring in part and dissenting in part.

Tyrone C. Fahner, Attorney General, of Springfield (Patricia Rosen, Assistant Attorney General, of Chicago, of counsel), for appellants.

Charles G. Chester, Thomas H. Donohoe, and Cathleen M. Keating, of Martin, Craig, Chester & Sonnenschein, of Chicago (Forrest Smith, of Dallas, Texas, of counsel), for appellee.

Michael J. Koenigsknecht, of Gardner, Carton & Douglas, of Chicago, for *amicus curiae* American Airlines, Inc.

George B. Christensen, Edmund J. Kenny, Arthur I. Gould, and Jeffry S. Spears, of Winston & Strawn, of Chicago, for *amici curiae* Amoco Oil Company *et al.*

JUSTICE UNDERWOOD delivered the opinion of the court:

Plaintiff, Mobil Oil Corporation, brought an action in the circuit court of Sangamon County under "An Act in relation to the payment and disposition of moneys received by officers and employees of the State of Illinois by virtue of their office or employment," commonly referred to as the "Monies Act" (Ill. Rev. Stat. 1977, ch.

127, par. 170 *et seq.*) to compel the return of approximately $8 million which it paid under protest pursuant to an assessment by the Department of Revenue under the Use Tax Act (Ill. Rev. Stat. 1979, ch. 120, par. 439.1 *et seq.*). The tax was assessed upon Mobil's use of three "refinery fuels," which are produced incidentally during the process of refining crude oil. The court held that the Department violated provisions of the Illinois Administrative Procedure Act (Ill. Rev. Stat. 1979, ch. 127, par. 1001 *et seq.*) when it developed its policy and method of imposing the tax, and that, if the use of refinery fuels was taxable at all, the Department did not use the proper method of calculating the tax. The court held that Mobil was entitled to a refund of the tax paid under protest, plus interest. The Department appealed, and Mobil cross-appealed, asserting that the Use Tax Act is unconstitutionally ambiguous as applied to the facts of this case. We allowed the Department's motion for direct appeal under Rule 302(b) (73 Ill. 2d R. 302(b)). American Airlines, Inc., has, by leave of court, filed an *amicus* brief limited to disposition of income earned on the protest fund.

The facts of this case are undisputed although the conclusions drawn by the parties differ. For the purpose of refining it into saleable products, Mobil purchases crude oil from various producers, including Illinois producers, and from "resellers" who act as middlemen between producers and refineries. All the crude oil is refined; none is used in its unrefined state, and none is left over after the refinery process is complete. However, not all of the crude oil can be successfully refined into saleable products, and some of those products have no market value.

Three products of the refinery process are used by Mobil in the refinery, are not resold in any form, and are at issue here as the subject of the use tax. Two of them,

catalytic coke and process gas, are waste products which have no market value. The third, heavy oil, is a by-product which can be and is sold to heavy industry as a high sulphur fuel, but it commands a much lower market price than the "premium products" (*e.g.*, gasoline, jet fuel, diesel fuel, and home heating oil). The catalytic coke, process gas and heavy oil, called "refinery fuels" because Mobil burns them for heat, are derived from crude oil, but, because they are chemically different from crude oil (different in molecular structure), they are said not to "exist" in the crude oil. They are, however, produced solely from the material that makes up the crude oil; no other matter is added to crude oil which becomes a part of these refinery fuels. A brief description of the refining process will indicate how these fuels are produced and used.

The refining process begins with the distillation of crude oil which yields several products, some of which are sold without further refining. One of the distillates, gas oil, is further refined in the fluid catalytic cracking (FCC) unit. Gas oil is injected under pressure into the FCC unit at approximately 650° F. It vaporizes upon contact with a sand-like catalyst, heated to about 1250° F, which is also circulated through the FCC unit. The catalyst causes the vaporized gas oil molecules to be "cracked"—that is, chemically altered—into smaller, lighter molecules. The catalyst, although it causes the chemical reaction, does not itself become a part of the newly formed substances, nor is it either chemically altered or consumed by the reactions. It does, however, become neutralized by a fine coating of carbon, released from the gas oil as it is cracked, which adheres to it. This coating is called "catalytic coke."

Because it is not economically feasible to discard the spent catalyst, Mobil regenerates it by oxidizing the catalytic coke; the regenerated catalyst is recirculated in

the FCC unit. The oxidation of the catalytic coke creates heat which maintains the temperature of the catalyst, thus sustaining the operation of the FCC unit. Two waste gases, carbon monoxide and carbon dioxide, are also produced from the oxidation of catalytic coke. They are very hot and must be cooled before release to the atmosphere. (Carbon monoxide, a poison, is burned before the gas is cooled.) The gases are routed through a boiler for this purpose, and their heat is used to generate steam for the refinery's steam system.

Process gas is produced in the FCC unit and two other refinery units. It is a highly contaminated, flammable mixture of gases. Mobil does not have the capability of storing it and cannot sell it. Before it can be safely vented or "flared" to the atmosphere it must be burned. Mobil uses the heat generated by the burning in the refinery process.

Heavy oil is also produced in the refining of crude oil. Although its market value is low compared to the premium products, it can be sold as an industrial fuel. Mobil, however, does not sell all of its production of heavy oil; some is burned, and the heat is used in the refinery.

The Department assessed Mobil's use of these refinery fuels according to a formula which, in essence, was based upon the difference between the volume of crude oil purchased and the volume of products resold, measured by the purchase price of crude oil. The cornerstone of Mobil's argument is that the refinery fuels, catalytic coke, process gas and heavy oil, do not exist as such in the crude oil it purchases. Upon this premise rest its arguments that the Use Tax Act does not apply to the use of refinery fuels, and that if it does apply, the Department incorrectly valued them.

The Use Tax Act imposes a tax upon "the privilege of using in this State tangible personal property *** purchased at retail from a retailer." (Ill. Rev. Stat. 1979, ch.

120, par. 439.3.) Mobil contests the application of this language arguing that since catalytic coke, process gas and heavy oil do not "exist" in crude oil, they could not have been purchased, and, in any event, the crude oil was not purchased at retail from a retailer.

In *American Can Co. v. Department of Revenue* (1971), 47 Ill. 2d 531, this court rejected the argument that the use of a material in a form or identity different from that in which it existed at the time of purchase cannot be taxed. Although in that case the material at issue had undergone a *physical* change in form, we see no reason to differentiate between the chemical change here and the physical change in *American Can.* While catalytic coke, process gas and heavy oil may not exist in the chemical sense in crude oil, they are produced from it by chemically restructuring the molecules therein. The substance purchased as crude oil contains the substance which in its restructured form constitutes catalytic coke, process gas and heavy oil, and it is entirely clear to us that the refinery fuels were purchased in the statutory sense when the crude oil was bought. In *American Can* we were concerned with purchased materials which were put together before their use (raw materials to make machinery); we see no reason to reach a different result where the purchased material is altered before use.

Mobil also argues that it did not purchase crude oil "at retail" because its sole purpose in purchasing crude oil is to refine it, not to use it. Under section 2 of the Act "sale at retail" is defined as "any transfer of the ownership of or title to tangible personal property to a purchaser, for the purpose of use, and not for the purpose of resale in any form as tangible personal property to the extent not first subjected to a use for which it was purchased, for a valuable consideration: Provided that the property purchased is deemed to be purchased for the purpose of resale, despite first being used, to the

extent to which it is resold as an ingredient of an intentionally produced product or by-product of manufacturing. \*\*\*" (Ill. Rev. Stat. 1979, ch. 120, par. 439.2.) This court has held that a single sale is not an indivisible unit but taxability is determined by the uses to which the property is put. (*Columbia Quarry Co. v. Department of Revenue* (1968), 40 Ill. 2d 47, 51; *Granite City Steel Co. v. Department of Revenue* (1964), 30 Ill. 2d 552, 559.) In *Granite City* this court rejected a "dominant purpose" test urged by the taxpayer which would have resulted in excluding an entire purchase from the use tax if a portion of it was incorporated into a finished product for resale, even if the remaining portion was "used" within the meaning of the Act. In *Columbia Quarry* this court followed the same reasoning in upholding an assessment under the Retailers' Occupation Tax Act (Ill. Rev. Stat. 1961, ch. 120, par. 440) upon that portion of the purchased material which was used by the buyer and did not become part of a saleable product. In both of these cases the property purchased underwent chemical changes (metallurgical coal to coke in *Granite City*; limestone to calcium oxide and carbon dioxide in *Columbia Quarry*), and in both the chemically altered remainder, used but not resold, was held taxable. Despite Mobil's contrary contention, we believe these two cases are fundamentally indistinguishable from the one before us. In all three cases, the purchaser intends to use the material purchased in both its original and in its chemically altered form. The fact that the factor motivating Mobil in its purchase was not the use of the refinery fuels is not relevant as long as their use is intentional. That the use is intentional is not disputed by Mobil, and testimony established that the refinery was designed to use the refinery fuels and that their use is necessary to its successful operation. It is quite clear to us that Mobil purposefully uses these products, which are invariably created in the

refining process. As in *Granite City* and *Columbia Quarry* it is this intentional, purposeful use which triggers the application of the Act.

It would seem that if one has made a purchase at retail, the purchase was made from a retailer. Mobil argues, however, that this court's decision in *Dearborn Wholesale Grocers, Inc. v. Whitler* (1980), 82 Ill. 2d 471, indicates that the determination of whether a seller is a retailer is based upon the nature of the seller's business and not the use to which the object of the sale is put. *Dearborn*, however, does not so hold. Rather, it simply held that the Department's *prima facie* case of retailers' occupation tax liability, built upon the taxpayer's lack of documentation that several sales were to buyers for resale, was rebutted by *Dearborn's* uncontroverted evidence that it made no retail sales. It has long been the rule in this State that one who sells "tangible personal property for use or consumption and not for re-sale, and does so not occasionally but as a business or occupation" is making retail sales subject to the Retailers' Occupation Tax Act. (*Franklin County Coal Co. v. Ames* (1934), 359 Ill. 178, 183.) The application of the Act to the sale depends upon whether the purchased property was used or consumed by the buyer or whether it was resold by the buyer. (See, *e.g., American Airlines, Inc. v. Department of Revenue* (1974), 58 Ill. 2d 251; *Burrows Co. v. Hollingsworth* (1953), 415 Ill. 202; *Modern Dairy Co. v. Department of Revenue* (1952), 413 Ill. 55.) It matters not that the seller holds himself out as a wholesaler (*Franklin County Coal Co. v. Ames* (1934), 359 Ill. 178) nor that he is engaged in a business not typically associated with retail sales (*cf. Bradley Supply Co. v. Ames* (1934), 359 Ill. 162, 170 (building contractors)). Although the court did not address this argument in *American Can, Granite City* and *Columbia Quarry*, the rule of *Franklin County Coal Co.* was applied in those cases—if

one purchases a product for use or consumption from a seller who is in the business of selling that product, one has purchased the product at retail from a retailer for purposes of the Retailers' Occupation Tax Act and the Use Tax Act. To the extent that *Trans-Air Corp. v. Department of Revenue* (1980), 86 Ill. App. 3d 750, *Humphrey Cadillac & Olds, Inc. v. Department of Revenue* (1979), 68 Ill. App. 3d 27, and *Du Page Aviation Corp. v. Department of Revenue* (1976), 37 Ill. App. 3d 587, may indicate otherwise they are no longer authoritative.

Nor do we believe that the Department's failure to assess Illinois producers/sellers under the Retailers' Occupation Tax Act for sales of crude oil supports Mobil's argument that Illinois producers are not retailers. Under *Granite City* and *Columbia Quarry* Mobil's suppliers are clearly making retail sales subject to the Retailers' Occupation Tax Act to the extent that components of the crude oil are used or consumed but not resold. Where the sale of personal property is subject to the tax the State may proceed against either the seller or the buyer (*People v. Buffalo Confectionery Co.* (1980), 78 Ill. 2d 447, 460; *Klein Town Builders, Inc. v. Department of Revenue* (1966), 36 Ill. 2d 301, 304), and the State will not be estopped except under extraordinary circumstances (*People ex rel. Scott v. Thoroughbred Enterprises, Inc.* (1973), 56 Ill. 2d 210; *Austin Liquor Mart, Inc. v. Department of Revenue* (1972), 51 Ill. 2d 1). Such circumstances do not exist here.

Mobil also argues that the Use Tax Act as applied to the facts of this case is so vague and ambiguous as to render it unconstitutional. In support Mobil again notes that the Department has never assessed the use of refinery fuels under the Use Tax Act or the sales of crude oil by Illinois producers under the Retailers' Occupation Tax Act. Mobil also cites the testimony and memoranda of various Department personnel to demonstrate the uncer-

tainty and misunderstanding the Department itself exhibited during the course of the audit of Mobil. This testimony, it seems to us, demonstrates more the auditors' lack of understanding of the technical and complex process of refining crude oil than their lack of understanding of the operation and application of the Use Tax Act. This lack of technical expertise also explains why tax liability had not been asserted by the Department in this area previously. This lack of knowledge, however, cannot be attributed to Mobil, which was certainly aware it was using or consuming a portion of its crude-oil purchases. The statute and the decisions in *Granite City* and *Columbia Quarry* clearly indicate such use is taxable. The ambiguity arises, we believe, only if one accepts the disingenuous argument that catalytic coke, process gas and heavy oil are not "purchased at retail." For the reasons earlier discussed, we believe there is no merit in this argument. Once it is discarded, the "ambiguity" disappears and the use of the refinery fuels is clearly taxable, the "confusion" of Department personnel notwithstanding. (*Cf. Illinois Power Co. v. Mahin* (1978), 72 Ill. 2d 189, 195.) Therefore, we hold the statute is not unconstitutionally vague or ambiguous as applied to the use of refinery fuels. For these same reasons we cannot accept Mobil's argument that it was deprived of notice, and therefore of due process, by the Department's late recognition that the use of the refinery fuels was subject to the Use Tax Act.

Mobil argues, too, that it was prejudiced and denied due process because it was not given proper notice of what it characterizes as the Department's change in policy regarding the taxability of the use of refinery fuels. This contention is made in connection with its argument that the Department failed to comply with the Illinois Administrative Procedure Act (Ill. Rev. Stat. 1979, ch. 127, par. 1001 *et seq.*). The trial court held that the De-

partment violated this act when it decided to tax the refinery fuels, but that court apparently ignored a rule, adopted by the Department in 1969, prior to the enactment of the Illinois Administrative Procedure Act, which we think clearly governs. The rule was adopted following this court's decision in *Granite City* and *Columbia Quarry*. Use Tax Rule 11, which adopted by reference article 2(3) of the Retailers' Occupation Tax Act rules, states:

> "Divisible Type of Sale. There can also be a divisible type of sale where the tangible personal property is bought partly for "use" and partly for "resale" in the first place. An example of this is the sale of coal and coke to a steel manufacturer who buys coal and coke partly to produce heat for "use" in the manufacturing operation, and partly to provide carbon as an ingredient of the steel as well as various by-products which the purchasing manufacturer will sell. In this case, the coal and coke bought for "use" in the manufacturing operation are taxable, and the sale of the coal and coke which the purchaser bought to provide carbon is a nontaxable sale for resale."

Mobil does not argue that this rule does not apply or cannot be applied to its purchase of crude oil and use of the refinery fuels. Rather, the argument appears to be that the Department's failure to assess the tax in the past amounts to a policy rule which cannot be changed without first complying with the publication, notice and hearing requirements of the Illinois Administrative Procedure Act. At trial, Mobil introduced various letters and memoranda written by Department employees and consultants which evince some confusion and disagreement within the Department on the issue of the taxability of refinery fuels. Also introduced was a Department memorandum to its auditors which explained how to assess the tax. It is this memorandum which is asserted to be the "rule" subject to the Illinois Administrative Procedure Act. Mobil also notes that the Department failed to assert the applicability of Use Tax Rule 11 until the "eve of trial."

As we have previously stated here, we believe the applicability of the tax was evident from the opinions of this court in *Granite City* and *Columbia Quarry*. Use Tax Rule 11 is a clear expression of Department policy; it adequately states the rule of *Granite City*; and it clearly applies to the use of refinery fuels. The Mobil refinery was constructed between June 1970 and December 1972, and Mobil was on notice of the policy long before the audit began. Nor do we believe that the failure to previously assess the tax amounts to a "policy" within the meaning of the Illinois Administrative Procedure Act. The Department's policy was clearly set out in Rule 11, which incorporated our earlier holdings. Although the Department may have been late in recognizing and implementing its full scope, we do not believe that the Illinois Administrative Procedure Act requires republication of the rule. The Department's memorandum, although not mentioning Rule 11 specifically, was simply an explanation to its auditors of the mechanics involved in computing the tax. The memorandum, we believe, is the kind of "intra-agency memoranda" which is excepted from the Illinois Administrative Procedure Act's definition of a "rule." (Ill. Rev. Stat. 1979, ch. 127, par. 1003.09.) In our judgment the Act was not intended to apply to every agency explanation of existing policy to its employees, where they had either applied it incorrectly or failed to apply it at all. Mobil's interpretation, which would seem to require publication in each such instance, would, it seems to us, virtually immobilize the Department. We hold, therefore, that Mobil had adequate notice of the taxability of the use of refinery fuels and that the Department did not violate the provisions of the Illinois Administrative Procedure Act in assessing the tax.

Mobil next argues, and the trial court held, that if the use of refinery fuels is taxable they must be valued by their "relative sales value" rather than by the cost of the crude oil. The formula used by the Department allocated

an ascertainable percentage of the volume of the purchased crude oil to the production of refinery fuels. The tax was assessed on the cost of the crude oil. The relative-sales-value method assigns to each product a cost figure based upon its relative share of the total price received when all the products are sold. Under this method, since catalytic coke and process gas have no market value, there would be no tax due on them; and since the market value of heavy oil is very low compared to the premium products, it would be assigned a cost far below that of crude oil. Mobil's argument, supported by the only witness on the issue, is that the relative-sales-value approach "is the only method of cost allocation recognized by the seven major oil companies and the American Petroleum Institute." The Department argues that the refinery fuels were purchased as crude oil and that the formula used correctly allocates a portion of the crude oil to the production of them and correctly measures the tax by the price of the crude oil. Mobil does not dispute the mechanics of the formula used by the Department.

We have previously held that, for purposes of the use tax, the refinery fuels were purchased as crude oil. The Use Tax Act must be computed upon the "selling price" (Ill. Rev. Stat. 1979, ch. 120, pars. 439.3, 439.2), which in this case is the price paid for the crude oil. Although Mobil's argument here was not specifically addressed by the court in *Granite City*, the court there held that the use tax was measured by the purchase price of the metallurgical coal and coke. (30 Ill. 2d 552, 560.) We see no meaningful distinction between that case and this. Although we do not doubt that as a method of cost accounting the relative-sales-value approach has great merit, the "selling price," as it is used in the statute, refers not to potential resale value but rather to the price paid for the property. The potential resale value of the components of a barrel of crude oil is wholly irrelevant to the imposition of a tax measured

by the price paid for the barrel. The method used by the Department to assess the tax was, therefore, proper.

Since we hold that the tax was properly assessed and Mobil is not entitled to a refund, we do not reach the question of Mobil's right to interest under the Monies Act.

Accordingly, the judgment of the circuit court is reversed, and the cause is remanded for entry of judgment in favor of defendant.

*Reversed and remanded,*
*with directions.*

JUSTICE SIMON, concurring in part and dissenting in part:

While I agree with the majority's conclusion that Mobil's use of its refinery fuels is subject to the use tax, I disagree with the method adopted to calculate that tax.

As the majority explains, Mobil purchases crude oil from a source not subject to the Illinois retailers' occupation tax. From that oil, Mobil makes two kinds of products: "Premium products" and "refinery fuels." The premium products are sold on the open market and thus are not subject to the use tax. The refinery fuels, catalytic coke, process gas and heavy oil, are essentially by-products of the process by which the premium products are made. They have little or no value on the open market. Mobil itself uses them, however, for heating. Thus, they become subject to the use tax.

The issue on which I disagree with the majority is how much tax. The use tax is calculated on the selling price of the item taxed. (Ill. Rev. Stat. 1977, ch. 120, par. 439.3.) There is no selling price here for refinery fuels, however, because Mobil never purchased refinery fuels. It purchased crude oil. The two products contained in it were a package deal. Thus, the difficult issue the court is faced with is how to allocate the price paid for the crude oil between the premium and the lower-grade products.

There is no obvious way to make such an allocation.

Any method will involve some element of fiction, because it is impossible to attach separate price tags to two items that were in fact purchased together. Nonetheless, there are fair and realistic ways to go about making the allocation which approximate what the selling prices of the two items would have been had they been sold separately. The majority unfortunately has not chosen such a method.

The majority allocates the selling price solely on the basis of volume. Thus, if we can assume for the purpose of easy calculation that a barrel of crude oil sells for $100 and yields one-half barrel of the low-grade refinery fuels and one-half barrel of the premium products, the tax would be calculated as if Mobil had paid $50 for the low-grade fuels.

That adds up to quite a high tax on the privilege of using something that is practically worthless. An example will illustrate the absurd results such a method of calculation can lead to.

A maker of chinchilla coats might purchase live chinchillas for $500. When they arrive at his workshop, he slaughters them, takes their pelts to make coats, and grinds the rest of their bodies into cat food to feed the cats he keeps around to control mice. If the animal's body without its pelt constitutes three-fifths of its total volume, the tax will be figured as if the coat maker paid $300 for his cat food. At a tax rate of 4% (Ill. Rev. Stat. 1977, ch. 120, par. 439.3), he will pay $12 in tax for an amount of cat food that he could have purchased at retail for 37 cents.

I believe a better way to allocate the price of crude oil between premium and low-grade products is the relative-sales-value method. Under such a method, the ratio of the market prices of the two products plays a big part in allocating the purchase price of the raw combined commodity. The price paid for each part of the whole is thereby made to bear some resemblance to its actual value. Thus if a barrel of the premium-grade product is worth nine times what a barrel of the low-grade product is worth, and one barrel

of crude oil produces one-half barrel of each product and sells for $100, $90 would be allocated to the premium products and $10 to low-grade refinery fuels.

The majority's formula encourages waste. The fuels in issue here are essentially by-products of the refining process. They command a low price on the open market, presumably because they are not very useful. There must be drawbacks to using these fuels rather than the premium products. Taxing their use at excessive rates may well discourage their use entirely. Yet because the premium products cannot be made without also making the low-grade products, the only thing to do with the by-product may be to throw it away and use premium products instead—a foolish waste of not inexhaustible resources.

Moreover, I cannot believe that such a result is required by the statute. The statute requires that the selling price be used to determine the amount of tax. Both the method approved by the majority and the one I advance are based on the selling price. The statute says nothing about how to allocate that price between two products made from the purchased commodity.

The use tax was enacted to fill in the gaps left by the retailers' occupation tax (commonly known as the sales tax). The use tax prevents the avoidance of tax by purchasing goods out of State and shipping them into Illinois for use. Because of the use tax, no one will be tempted to buy goods at retail outside Illinois and bring them here. The State tax will be the same in any event: 4%.

The trouble with the majority's calculation of the use tax is that it will ultimately generate a tax greater than 4% on Mobil's total purchase. It will more than fill the gap left by the sales tax.

If Mobil had purchased the entire barrel of crude for $100 out of State wholly for its own use in Illinois, it would have been subject to a use tax of $4. Similarly, if it had purchased the barrel in Illinois from a retailer, a $4

sales tax would have to be paid. The tax is the same because the use tax is designed to neither encourage nor discourage commercial transactions not subject to the sales tax.

Now assume for the sake of isolating the relevant issue that crude oil can be separated into the two products at no cost. Thus a $100 barrel of crude can be separated into a half barrel of premium product that will sell for $90 and a half barrel of low-grade refinery fuel that will sell for $10. If both products were sold by the refiner, the tax would be the same—$4 (4% of $90 and 4% of $10). Only when the refiner uses one product and sells the other and the majority's formula is employed does that figure vary. Under the majority's formula Mobil must pay $2 in use tax (4% on $50 which is one-half of the original cost). When it comes time to sell the premium product, however, its market value will still be $90. The sales tax on it will therefore be $3.60, bringing the total tax receipts by the State of Illinois to $5.60. Under my formula, the tax would remain $4.

This peculiarity in the majority's formula can work to the Department of Revenue's disadvantage too. Using the same example, suppose Mobil had used its premium product and sold its low-grade product. Allocating the $100 purchase price by volume, only a $2 tax could be collected for the use of the premium product. The low-grade product will not, however, command any higher price on the open market than it would in the absence of the tax. It will still be sold for $10. The tax on it will be 40 cents, making the total tax only $2.40.

Such a result is neither logical nor fair; clearly it is not consistent with the purpose of the statute. I therefore dissent from that portion of the majority's conclusion.

CHIEF JUSTICE RYAN joins in this partial concurrence and partial dissent.