**CONOCO, INC., Plaintiff–Appellant and Cross–Appellee,**

v.

**Roger TINKLENBERG, Director of Finance For the City of Commerce City, State of Colorado, and City of Commerce City, a municipal corporation, Defendants–Appellees and Cross–Appellants.**

No. 03CA1576.

Colorado Court of Appeals, Div. V.

April 21, 2005.

Certiorari Denied Oct. 3, 2005.

Oreck, Bradley, Crighton, Adams & Chase, Nicole Crighton, Boulder, Colorado; Oreck, Bradley, Crighton, Adams & Chase, Jesse R. Adams, III, New Orleans, Louisiana, for Plaintiff–Appellant and Cross–Appellee.

Light, Harrington & Dawes, P.C., Steven J. Dawes, Catherine A. Silburn, Denver, Colorado, for Defendants–Appellees and Cross–Appellants.

HAWTHORNE, J.

In this dispute arising out of an assessment of municipal use tax, plaintiff, Conoco, Inc., appeals the judgment entered against it and in favor of defendants, the City of Commerce City and Roger Tinklenberg, Director of Finance for Commerce City. Commerce City cross-appeals that portion of the trial court's judgment which required it to pay to Conoco interest earned on funds deposited in escrow. We reverse the judgment as to the interest on the escrowed funds and otherwise affirm.

During all time periods in question, Conoco owned and operated an oil refinery in Commerce City. As part of its operations, Conoco purchases crude oil from various suppliers to refine into various products for resale, including motor fuels and asphalt for road pavement. In the refining process, the crude oil is heated, creating a gas that is referred to as waste gas. Waste gas is created solely from the constituent elements of crude oil.

Waste gas is an unavoidable by-product of Conoco's oil refining process. Conoco presented testimony that no market exists for waste gas. However, Conoco combines waste gas with natural gas, which is purchased outside the refinery, to make a product called fuel gas. The fuel gas is burned in the refinery to provide heat for the refining process and to heat Conoco's administrative offices. Conoco also uses waste gas as a reducing agent and to fuel pilot lights. Finally, in certain high pressure, "emergency" situations, Conoco disposes of some waste gas as wastage through an operation known as flaring.

Commerce City selected Conoco for an audit and determined that Conoco had not reported its consumption of waste gas on its sales or use tax returns. It therefore issued a demand for payment in which it assessed use tax on Conoco's consumption of waste gas, along with a penalty and interest.

Conoco appealed the demand for payment to the city's finance director, who affirmed the assessment of use tax. Conoco then deposited the disputed amount with the city under protest in accordance with the Commerce City Sales & Use Tax Code & Regulations (CCSUTC or CCSUTR, respectively).

At trial, Conoco presented testimony that the production of its fuels and asphalt products creates waste gas in an amount equal to approximately one-half percent to four percent of the crude oil purchased by Conoco. The amount of waste gas derived from the refinement of crude oil varies based on the type of crude oil being processed and other factors. Some types of crude oil yield more waste gas than others.

As an example of its use of waste gas, in one year Conoco consumed approximately 711,153,000 BFOE (Barrel Fuel Oil Equivalent) of fuel gas, which was composed of approximately 209,901,000 BFOE of natural gas and slightly more than 500,000,000 BFOE of waste gas. In that year, Conoco estimated that the waste gas it consumed was approximately 2.5% of the crude oil purchased by the refinery. Conoco also presented testimony that if it did not burn waste gas at the refinery that year, it would have had to purchase an additional 500,000,000 BFOE of natural gas or devise some other way to provide additional heat.

Following a two-day trial, the trial court affirmed the imposition of use tax and ordered that Commerce City use the escrowed funds to satisfy the taxes owed by Conoco. The court further directed that the interest earned on the escrowed funds be paid to Conoco.

## I.

Conoco first contends that the trial court erred in concluding that it is liable for payment of use tax because there had been no sale "at retail" as required by the city's tax code and that the "retail sale" found by the trial court was purely fictional because there is no market for waste gas. We reject these contentions.

■ A tax statute is construed to give consistent, harmonious, and sensible effect to all its parts. *J.A. Tobin Constr. Co. v. Weed,* 158 Colo. 430, 435, 407 P.2d 350, 353 (1965). There is a "strong presumption that taxation is the rule and exemption the rare exception." *Howard Elec. & Mech., Inc. v. Dep't of Revenue,* 771 P.2d 475, 480 (Colo.1989) (quoting *Southwest Catholic Credit Union v. Charnes,* 665 P.2d 626, 627 (Colo.App.1982)).

■ A sales tax is a tax on a purchase, whereas a use tax is a levy upon the privilege of storing, using, or consuming tangible personal property purchased at retail. *Int'l Bus. Machs. Corp. v. Charnes,* 198 Colo. 374, 377, 601 P.2d 622, 624 (1979); *see* CCSUTC §§ 20–1(1–1), 20–2(2–1), 20–3(3–70), (3–71).

■ A use tax is supplementary to, rather than separate from, a sales tax. Vendors are liable for the payment of sales tax, and if a sales tax has not been collected by a vendor, the purchaser is liable for the use tax. The components of use tax liability are (1) tangible personal property (2) purchased at retail (3) without prior payment of sales or use tax and (4) use or consumption. Only tangible personal property purchased at retail is subject to use tax. *Howard Elec. & Mech., Inc. v. Dep't of Revenue, supra,* 771 P.2d at 477; *see also* CCSUTR § 20–5–B–(4).

Here, it is undisputed that waste gas is tangible personal property, that there was no prior payment of sales or use tax, and that the waste gas was used or consumed by Conoco within the municipal boundaries of Commerce City. Conoco maintains, however, that use tax cannot be levied on waste gas because the waste gas was not purchased at "retail." We are not persuaded.

■ A retail sale is defined by the Commerce City tax code as "all sales except wholesale sales." CCSUTC § 20–3(3–51); *see also* CCSUTC § 20–3(3–74), CCSUTR § 20–3–74 (declaring that "[a]ll sales are either wholesale or retail"). A wholesale sale is a sale "to licensed retailers, jobbers, dealers or wholesalers *for resale."* CCSUTC § 20–3(3–74) (emphasis added). Under the tax code, "[s]ales by wholesalers to consumers are not wholesale sales." CCSUTC § 20–3(3–74). Thus, under the code, if a purchase is not made "for resale," the purchase must be considered a purchase at retail.

■ Because of these specific code definitions, a purchaser may buy in large quantities what is commercially known as "wholesale" and get wholesale prices, and still the sale may not be exempt. *Carpenter v. Carman Distrib. Co.,* 111 Colo. 566, 575, 144 P.2d 770, 774 (1943). Therefore, a reviewing court must look beneath the surface of the transaction to properly classify the transaction as a wholesale or retail sale. The standard to be applied in such judicial inquiries is whether the primary purpose of the purchase was the acquisition of the item for resale in an unaltered condition and basically unused by the purchaser. If so, the sale was a wholesale transaction. *A.B. Hirschfeld Press, Inc. v. City & County of Denver,* 806 P.2d 917, 921–24 (Colo.1991).

Exemption depends entirely upon the disposition of a purchased product by the buyer. *Carpenter v. Carman Distrib. Co., supra.* A wholesale transaction may be transformed into a retail one upon the company's ultimate election to use or consume the purchased material in its own business operations. The use or consumption then triggers use tax based on a retroactive recognition that a previous sale earlier thought to be wholesale was actually retail. A buyer's tentative characterization of a sale as "wholesale" may be corrected to "retail" once later events are taken into consideration. *Int'l Bus. Machs. Corp. v. Charnes, supra.*

Consistent with this rule, the Commerce City tax code provides that "tangible personal property that was purchased tax-free for resale or as an ingredient or component part of a manufactured or compounded product

and is subsequently withdrawn from the stock and/or modified prior to use shall be subject to" use tax. CCSUTC § 20-1(1-1). The tax code further provides:

> [A sales or use tax] falls upon every separate transaction involving the sale ... of tangible personal property at retail. If the property is purchased and utilized by the purchaser for his own general business or personal use, other than for customer demonstration, display, or stock inventory purposes, there is due a tax upon the purchase price as specified in the Code. An example of such taxable use would be the use of an automotive vehicle by the owner, salesmen or employees, etc., of an auto agency for their own personal use.

CCSUTR § 20-4-1.

The purchase transaction and controlling legislation before us are substantially similar to the those considered by the Illinois Supreme Court in *Mobil Oil Corp. v. Johnson*, 93 Ill.2d 126, 66 Ill.Dec. 285, 442 N.E.2d 846 (1982). There, Mobil Oil purchased crude oil for refining and in its refinery process created certain products, referred to as refinery fuels, which had no market value and could not be resold in any form. The refinery fuels were chemically different from crude oil and therefore were said not to "exist" in the crude oil. However, as with the waste gas at issue here, they were created solely from the constituent elements of the crude oil. Because Mobil could neither sell nor safely store these products, it burned the refinery fuels and used the heat generated by the burning in the refining process.

Mobil contested an assessment of tax upon the use of the refinery fuels, arguing that because they did not "exist" in the crude oil, they could not have been "purchased" when the crude oil was purchased and that, in any event, the crude oil was not purchased "at retail."

The Illinois Supreme Court first rejected the contention that the refinery fuels were not purchased when the crude oil was purchased simply because they existed in a different form when they were consumed. The court noted that the substance purchased as crude oil contained the substance which in its restructured form constituted the refinery

fuels, and thus these products were purchased "in the statutory sense" when the crude oil was bought. *Mobil Oil Corp. v. Johnson, supra,* 93 Ill.2d at 132, 66 Ill.Dec. 285, 442 N.E.2d at 849.

The court also rejected Mobil's arguments that the purchase of the crude oil, previously characterized as "wholesale," could not be recharacterized as "retail" because Mobil's sole purpose in purchasing the crude oil was to refine it for resale, and not to use it. The court held that a sale is not an indivisible unit, but that taxability will be determined by the uses to which the property is put. The court also held that because Mobil used the refinery fuels intentionally, whether Mobil was motivated to purchase crude oil for such use was immaterial. The court concluded that Mobil's suppliers were clearly making taxable retail sales to the extent that the components of the crude oil were used or consumed and not resold. *Mobil Oil Corp. v. Johnson, supra,* 93 Ill.2d at 135, 66 Ill.Dec. 285, 442 N.E.2d at 851.

■ A similar analysis applies here. The waste gas is created solely from the constituent elements of the crude oil, and it is therefore the actual sale of the crude oil, not a fictional sale of the waste gas, that is at issue. As does Illinois, Colorado will recharacterize a previously defined wholesale sale to reflect a sale at retail where the facts so warrant. *See Int'l Bus. Machs. Corp. v. Charnes, supra.* The fact that Conoco creates and consumes waste gas only as an unwanted byproduct of its crude oil refining process is immaterial, because its consumption of the waste gas is intentional. Testimony established that Conoco's refinery has specifically been designed to use the waste gas for heat and that Conoco would have to purchase additional natural gas or make some other arrangements if it did not consume the waste gas. It is the intentional, purposeful use and the failure to resell the waste gas that transform the waste gas portion of the crude oil wholesale sale into a retail sale. Thus, that portion of the crude oil that was consumed as waste gas by Conoco is properly characterized as purchased at retail.

Because no sales tax was paid by Conoco at the time the crude oil was purchased, the consumption of waste gas is subject to use tax. *See Int'l Bus. Machs. Corp. v. Charnes, supra,* 198 Colo. at 378–79, 601 P.2d at 625. Under the Commerce City tax code, the use tax liability attached when the transaction was converted from tax-free status to a taxable use. *See* CCSUTC § 20–1(1–1). Thus, the use tax liability was incurred at the point the crude oil, in the reconstituted form of waste gas, was consumed by Conoco.

Conoco cites *C.F. & I. Steel Corp. v. Charnes,* 637 P.2d 324 (Colo.1981), to support its argument that its consumption of waste gas was not a taxable event. In *C.F. & I. Steel,* a steel manufacturer diverted certain raw materials into a temporary use as molds, stools, cinder pots, and pig machine molds before returning the materials to the normal steel manufacturing process as scrap iron. The supreme court concluded that this "brief utilization" of the raw materials in this manner was akin to storage of the materials and was therefore not a taxable event. In reaching this conclusion, the court emphasized that a contrary analysis would cause the materials to be subject to multiple taxation.

By contrast, the waste gas at issue here was never returned to the refinery process, but rather was consumed by Conoco. Accordingly, the analysis in *C.F. & I. Steel* is inapposite.

Conoco also asserts that characterization of the sale as a retail sale is prohibited by the reasoning of the supreme court in *Rocky Mountain Prestress, Inc. v. Johnson,* 194 Colo. 560, 574 P.2d 88 (1978). There, a building construction company designed and fabricated its own pre-cast concrete structural components for use in its building projects. The forms were fabricated by the company outside of Denver, but placed into construction projects in Denver. Denver sought to impose a use tax upon the gross value of all materials, labor, and engineering services used in the design and fabrication of the pre-cast concrete forms and postulated a fictional "sale" of the pre-cast forms by the company to itself.

The supreme court disapproved of the creation of a "fictional purchase at retail" of the pre-cast structural forms under those circumstances. The court found significant the absence of any market for the pre-cast concrete forms separate from the market for construction of the buildings using those forms, and that the construction of the concrete forms was integrally related to the total construction enterprise carried on by the company. However, the court did not address whether the original sale to the company of the materials used to manufacture the forms could have been considered the relevant actual retail sale.

Here, Commerce City's imposition of a use tax is not based upon a fictional sale of waste gas that occurred when Conoco consumed the waste gas it produced. *Cf. W. Paving Constr. Co. v. Beer,* 917 P.2d 344, 348 (Colo. App.1996) (holding that a taxable event has occurred when a manufacturer of tangible personal property uses or consumes items of tangible personal property manufactured by it, which product it also sells or installs for a price in the ordinary course of its business at retail). Rather, Commerce City is imposing a use tax based on the original sale of a portion of the crude oil to Conoco, because Conoco paid no sales tax on that portion of the crude oil and then later consumed it as waste gas. *See Rocky Mountain Prestress, Inc. v. Johnson, supra,* 194 Colo. at 565, 574 P.2d at 91–92 (holding that the essential purpose of use tax is the recoupment of lost sales tax revenue).

Under the circumstances here, we conclude that the trial court did not err in holding that Conoco's consumption of crude oil in this form was a taxable event.

## II.

Conoco next contends that the trial court erred in affirming the fair market valuation assessed by the city. Specifically, Conoco contends that there can no fair market valuation because the evidence established the absence of any market for waste gas. We disagree.

The city's tax code requires that use tax be "computed and paid on cost or fair market value, whichever is lower." CCSUTC § 20–3–69. Fair market value is

"the price a buyer is willing to pay and the seller is willing to accept under circumstances that do not amount to coercion." *Connell v. Sun Exploration & Prod. Co.*, 655 P.2d 426, 428 (Colo.App.1982) (quoting *City of Thornton v. Pub. Utils. Comm'n*, 157 Colo. 188, 196, 402 P.2d 194, 198 (1965)). The absence of an established market for an asset does not, however, preclude application of the fair market value standard. Rather, fair market value is a term that has long been used in the law as applicable to property having no actual current market place. *Whitlow v. Comm'r of Internal Revenue*, 82 F.2d 569, 572 (8th Cir.1936) (noting that in such a case, the term means "the sum that would in all probability result from fair negotiations between an owner who is willing to sell and a purchaser who desired to buy," quoting *De Laval Steam Turbine Co. v. United States*, 284 U.S. 61, 72, 52 S.Ct. 78, 80, 76 L.Ed. 168 (1931)); *see also Guggenheim v. Rasquin*, 312 U.S. 254, 258, 61 S.Ct. 507, 509, 85 L.Ed. 813 (1941) (holding that the absence of a market price is no barrier to valuation for purposes of assessing tax liability).

■ Here, Commerce City presented expert testimony regarding both the cost and fair market value of the waste gas. The witness testified that the fair market value could be derived by comparing the heat value of the waste gas used by Conoco with the heat value of unrefined natural gas purchased at the wellhead. The witness further testified that using a mathematical equivalence, and eliminating extraneous costs including transportation, refining, and market price fluctuations from the calculation, yielded an objectively reasonable comparison of natural gas, produced at its source without extra costs, to waste gas, and he thereby arrived at a fair market valuation. The expert also testified that use tax computed on a cost analysis was twice that of use tax computed on this fair market valuation.

■ Conoco maintains that this analysis has been rejected in *Rocky Mountain Prestress, Inc. v. Johnson, supra.* However, in that case the supreme court held only that a use tax could not be imposed under the Denver ordinance at issue based upon an assumed hourly rental value and that the tax could only validly be assessed based on the purchase price or fair market value, whichever was lower. Here, the trial court concluded that Commerce City's formula reasonably and fairly allowed for the determination of a fair market value of waste gas, and, there being evidence in the record to support the trial court's conclusion, it is binding on review. *See Connell v. Sun Exploration & Prod. Co., supra*, 655 P.2d at 428. While Conoco disputes the credibility and reasonableness of the expert witness's approach, such evaluations are for the trial court and will not be disturbed on appeal. *Cherry Hills Country Club v. Bd. of County Commr's*, 832 P.2d 1105, 1108 (Colo.App. 1992).

## III.

■ In its cross-appeal, Commerce City contends that it is entitled to all the interest earned on the escrowed funds pending resolution of the litigation and that the trial court thus erred in directing payment of the interest to Conoco. We agree.

In its order, the trial court required Commerce City "to utilize the escrowed funds to satisfy the taxes owed by [Conoco] and to forward all interest earned on those funds to [Conoco]."

The city's tax code provides:

Within fifteen (15) days after filing complaint, the taxpayer shall file with the District Court a bond in twice the amount of the taxes, interest, and other charges stated in the final determination by the City Manager which are contested on appeal; provided, that the taxpayer may at his option deposit the disputed amount with the City Manager in lieu of posting bond.

. . . .

At the conclusion of the action or the time for such appeal has expired, the funds deposited shall be, at the direction of the court, further retained by the Director and applied against the deficiency or returned

in whole or in part to the taxpayer with interest.

CCSUTC § 20–12–4.

Under the plain language of the tax code, the district court is granted authority to award interest to the taxpayer only when it orders that the funds deposited with the City Manager be returned in whole or in part to the taxpayer. Here, none of the deposited funds was directed to be returned to Conoco. Conoco has cited no authority that would permit the district court to require payment of interest to it when the deposited funds are not returned to the taxpayer.

 Generally, post-judgment interest statutes are designed to eliminate the financial incentive or disincentive to appeal and to ensure that a judgment creditor whose satisfaction is delayed because of an unsuccessful appeal receives the time value of the money judgment. *Rodriguez v. Schutt,* 914 P.2d 921, 929 (Colo.1996). That purpose would be defeated were we to construe the tax code to allow the return of interest to a party who appeals unsuccessfully.

Moreover, to award Conoco interest on the funds due Commerce City during the pendency of the litigation would result in a windfall to Concoco, because Conoco's tax liability would in effect be reduced by the amount of the interest. A windfall should be avoided if possible. *See Highlands Ranch Univ. Park, LLC v. Uno of Highlands Ranch, Inc.,* —— P.3d ——, 2005 WL 170735 (Colo.App. No. 03CA0724, Jan. 27, 2005).

The judgment is reversed as to the return of interest to Conoco and is affirmed in all other respects.

Judge VOGT and Judge NIETO concur.