686 So.2d 823 (1997)
STATE of Louisiana and Ben Morrison, as successor to Ralph Slaughter, Secretary, Department of Revenue and Taxation, State of Louisiana
v.
BP EXPLORATION & OIL, INC.
STATE of Louisiana and Ben Morrison, as successor to Ralph Slaughter, Secretary, Department of Revenue and Taxation, State of Louisiana
v.
STAR ENTERPRISE.
Nos. 96-C-0716, 96-C-2218.
Supreme Court of Louisiana.
January 14, 1997.
*824 George Julien Domas, Robert S. Angelico, Cheryl Mollere Kornick, Liskow & Lewis, New Orleans, for Applicant in No. 96-C-0716.
Richard P. Ieyoub, Attorney General, E. Kay Kirkpatrick, Asst. Attorney General, Emory A. Belton, Baton Rouge, Michael X. St. Martin, Houma, Les Anthony Martin, Philip F. Cossich, Jr., Darren David Sumich, Belle Chasse, Michelle M. Davis, Houma, for Respondent in No. 96-C-0716 and Applicant in No. 96-C-2218.
Judy Y. Barrasso, New Orleans, Hak K. Dickenson, Houston, TX, Catherine L. Zabel, for Marathon Oil Company, Amicus Curiae.
David Rollins Cassidy, David Robert Kelly, Leo Charles Hamilton, Baton Rouge, John F. Whitney, New Orleans, for Star Enterprise, Amicus Curiae.
Jesse R. Adams, Jr., Bruce James Oreck, New Orleans, for Mobil Oil Corp., and Murphy Oil USA, Inc., Amicus Curiae.
Robert L. Roland, Baton Rouge, for Exxon Corp., Amicus Curiae.
Frank P. Simoneaux, Timothy Joseph Poche, Baton Rouge, for CITGO Petroleum Corp., Amicus Curiae.
Ernest R. Eldred, Larry DeWayne Dyess, Baton Rouge, for East Baton Rouge Parish, Amicus Curiae.
David Rollins Cassidy, David Robert kelly, Leo Charles Hamilton, Baton Rouge, John F. Whitney, Breazeale, Sachse & Wilson, New Orleans, for Respondent in No. 96-C-2218.
Carey Joseph Messina, Baton Rouge, for Louisiana Chemical Association, Amicus Curiae.
VICTORY, Justice[*].
In these two consolidated writs, we determine whether the provision of La. R.S. 47:305D(1)(h) valuing refinery gas at 52 cents per thousand cubic feet multiplied by a certain fraction ("the 52 cent formula") for use tax purposes is a valuation provision or a value-based exemption, and determine the taxable value of refinery gas and coke-on-catalyst. We hold that the 52 cent formula is a valuation provision, not a value-based exemption. Further, we hold that coke-on-catalyst has not been shown to have a taxable value for use tax purposes.

FACTS AND PROCEDURAL HISTORY
BP Exploration & Oil Inc. ("BP") and Star Enterprise ("Star") operate refineries in Louisiana where they refine raw crude oil into finished products. As part of the process, BP and Star generate and burn two by-products of the crude oil, refinery gas and coke-on-catalyst. We previously described these two by-products in our earlier decision involving BP as follows:
Refinery gas (also called "waste" or "tail" gas) is a gaseous by-product of the process of refining the raw material, crude oil, into finished products for sale at retail. Although *825 the refinery gas generated from BP's refinery operations was not commercially marketable, BP scrubbed the refinery gas and used it to generate heat for boilers and other units in the refining process. BP's efficient use of refinery gas as an energy source effected a savings in the required amount of natural gas and other energy sources that BP otherwise would have had to purchase for its energy needs. Coke-on-catalyst is a solid by-product of the refining process (coke) that accumulates on the catalyst, a solid material used to enhance chemical reactions in the refining process. As the particles of catalyst become coated with coke, the catalyst loses its effectiveness. In order to reuse the catalyst, BP burned off the coke, thereby generating heat which BP captured and used in the refining operation.
BP Oil Company v. Plaquemines Parish Government, 93-1109 (9/6/94), 651 So.2d 1322, 1325 (on original hearing) ("BP Oil I").
The Louisiana Department of Revenue and Taxation (the "Department") is attempting to collect use taxes on this refinery gas and coke-on-catalyst from Star and BP at the same rate as natural gas under La. R.S. 47:302A(2) (providing for the imposition of a tax on the use of tangible personal property based on the "cost price" of the property) and La. R.S. 47:305D(1)(h). La. R.S. 47:305D(1)(g) and (h), contained in the Section entitled "Exclusions and exemptions from the tax," provides in pertinent part:
D. (1) The sale at retail, the use, the consumption, the distribution, and the storage to be used or consumed in this state of the following tangible personal property is hereby specifically exempted from the tax imposed by this Chapter:
(g) Natural gas.
(h) All energy sources when used for boiler fuel except refinery gas. Refinery gas shall be subject to the tax imposed by this Chapter, and similar local taxes, provided that its value shall be fifty-two cents per thousand cubic feet multiplied by a fraction the numerator of which shall be the posted price for a barrel of West Texas Intermediate Crude Oil on December first of the preceding calendar year, and the denominator of which shall be twenty-nine dollars, and provided further that such values shall be the maximum placed upon refinery gas....
La. R.S. 47:305D(1)(h) (eff. July 18, 1990)[2]. Exemptions under La. R.S. 47:305D(1)(g) and (h) have been suspended by the legislature for the time periods involved in these lawsuits. The Department claims that coke-on-catalyst is exempted under the "energy sources exemption" of 47:305D(1)(h) and that the 52 cent formula for refinery gas is a value-based exemption for the value of refinery gas which exceeds the 52 cent formula. Accordingly, the Department argues, because these exemptions have been suspended, Star and BP owe use taxes on the cost price of refinery gas and coke-on-catalyst.
On December 27, 1994, the Department filed suit against BP claiming that BP had failed to properly pay sales and use taxes on refinery gas and coke-on-catalyst. BP had been paying use taxes on refinery gas based on the 52 cent formula and did not pay use taxes on coke-on-catalyst prior to the BP Oil I case. The trial court granted the Department's motion for partial summary judgment and ruled that the valuation formula contained in La. R.S. 47:305D(1)(h) was an exemption from taxation which was suspended when the legislature suspended certain exemptions for sales and use taxes. After the trial on the issue of the actual value of refinery gas and coke-on-catalyst, the trial court held that "natural gas is an energy equivalent to those two by-products for the computation of the taxes that are due in this matter." The trial court rendered judgment in favor of the Department in the amount of $11,100,870.00 representing taxes, interest and attorney fees for use taxes from December 1, 1990 through July 20, 1995. The trial court granted BP's exception of prescription for the tax periods from December 1, 1988 *826 through November 30, 1990, and overruled BP's exception of prescription for the tax periods from December 1, 1990 through November 30, 1991. The Fourth Circuit Court of Appeal affirmed. State v. BP Exploration & Oil Inc., 95-2031 (La.App. 4th Cir. 1/31/96), 667 So.2d 1219. We granted a writ on May 17, 1996. State v. BP Exploration & Oil Inc., 96-0716 (5/17/96), 676 So.2d 99.
Similarly, the Department filed suit against Star seeking to recover use taxes on refinery gas and coke-on-catalyst. The trial court rendered a judgment and reasons for judgment on July 11, 1995 in favor of the Department holding that La. R.S. 47:305D(1)(h) created a tax exemption for refinery gas which was legislatively suspended and that both refinery gas and coke-on-catalyst could be taxed based on the products' cost price, which it found to be the price of natural gas. Star filed a suspensive appeal on July 14, 1995 and the Department filed a motion for partial new trial on July 20, 1995. The trial court considered the Department's motion "as a correction of an omission in the record; namely, that the judgment of July 11, 1995 inadvertently omitted specific monetary amounts" and issued a judgment on September 19, 1995 to correct the omission and to award specific amounts to the State. The September 19, 1995 judgment awarded $4,159,709.00 for taxes, interest and attorney fees on Star's use of refinery gas from January 1, 1992 through December 31, 1994; $2,386.964.00 for taxes, interest and attorney fees on Star's use of coke-on-catalyst from January 1, 1992 through December 31, 1994; plus additional unspecified amounts for the period from January 1, 1995 through April 20, 1995. Star filed a writ application and a suspensive appeal. The Fourth Circuit denied the writ application but then granted Star's request for a rehearing on this issue and consolidated the writ application with the appeal. On August 7, 1996, the Fourth Circuit reversed the trial court, holding that the 52 cent formula of La. R.S. 47:305D(1)(h) was a formula for computing the value of refinery gas and not an exemption. State v. Star Enterprise, 95-2124 (La.App. 4th Cir. 8/7/96), ___ So.2d ___ [1996 WL 447578]. The court of appeal further held that coke-on-catalyst has neither "actual cost" value nor market value for tax purposes and that Star had succeeded in proving that coke-on-catalyst is not the equivalent of natural gas. Finally, the court of appeal held that the September 19, 1995 judgment was rendered without jurisdiction and was therefore an absolute nullity. In its decree, the court of appeal held that to the extent that this decision conflicted with its previous decision in State v. BP Oil, that decision was overruled. We granted the Department's writ and consolidated these two cases for purposes of this opinion. State v. Star Enterprise, 96-2218 (La.9/19/96), 679 So.2d 409.

DISCUSSION

A. Refinery Gas
All parties argue that our decision in BP Oil I supports their opposing positions. In BP Oil I, a local government was attempting to collect use taxes on refinery gas at a rate higher than the 52 cent formula. The Department argues that in BP Oil I, we held that La. R.S. 47:305D(1)(h) established a value-based exemption from taxation for the value of refinery gas which exceeds the valuation set by the 52 cent formula. BP and Star argue that in BP Oil I, we held that La. R.S. 47:305D(1)(h) was a valuation provision that set the cost price of refinery gas for use tax purposes at the 52 cent formula.
In BP Oil I, we held, among other things, that La. R.S. 47:305D(1)(h), which set the maximum value at which local and state governments must assess refinery gas for local and state use tax purposes, did not violate La. Const. art. VI, sec. 29(A)[3] or La. Const. art. III, Sec. 16(B)[4]. BP Oil I, supra at 1328. In reaching this conclusion, we traced the legislative history of La. R.S. 47:305D(1)(h), which bears repeating with *827 some elaboration in this case as it clearly establishes that the provision is not an exemption.
La. R.S. 47:305, as originally set forth in the Revised Statutes of 1950, specifically exempted from sales and use tax the following pertinent items: gasoline, steam, water, electric power or energy and natural gas. In 1974, the statute was amended to exempt sales of fuel oil and coal when used for boiler fuel. An amendment in 1979 added wood waste and bagasse to the boiler fuel exemption which was then in paragraph (4). An amendment in 1980 added "and any materials and energy sources used to fuel the generation of electric power," substituted "all energy sources" for "fuel oil, wood waste and bagasse and coal," and added "except refinery gas when used for boiler fuel." Accordingly, prior to 1985, La. R.S. 47:305(4) provided exemptions for "(vii) Natural gas; (viii) All energy sources when used for boiler fuel except refinery gas when used for boiler fuel." Thus we held in BP Oil I that between February 1, 1985, the date the Parish was claiming taxes were due on refinery gas, and July 6, 1985, the effective date of Act No. 258, "all refinery gas was taxable ... whether used as boiler fuel or not, because there was no specific exemption of refinery gas [in La. R.S. 47:305(4)(vii)] and the energy sources exemption [La. R.S. 47:305(4)(viii)] specifically excepted refinery gas." BP Oil I, supra at 1332.
We explained the legislative history of the 1985 amendments to La. R.S. 47:305 in BP Oil I as follows,
Prior to the 1985 legislation fixing the value of refinery gas, there had been a longstanding dispute between state and local taxing authorities and taxpayers on the issue of whether refinery gas was subject to sales and use taxes. In 1972, the state taxing authority and the refining industry reached an administrative resolution of the dispute, agreeing that refinery gas would be taxed at four cents per 1,000 cubic feet. The parties later modified that agreement, effective January 1, 1985, to fix the value at fifty-two cents per 1,000 cubic feet, subject to annual adjustment.
By La. Acts 1985, No. 258, the Legislature adopted a formula "relative to the value of refinery gas for state and local sales and use taxation." Act 258 amended La.Rev. Stat. 47:305, a statute pertaining to exclusions and exemptions from sales and use taxes, to rewrite Subsection D (then Paragraph [4]) which had previously exempted from sales and use taxes "[a]ll energy sources when used for boiler fuel except refinery gas when used for boiler fuel." The amendment changed the present Subsections D(1)(g) and (h) in several ways as discussed hereinafter, but particularly added to the energy sources exemption in the present Subsection D(1)(h) a provision fixing the value of "[r]efinery gas when used for any taxable purpose" at fifty-two cents per 1,000 cubic feet in 1985, with an adjustment formula for ensuing years. The amendment specifically provided that "such values shall be the maximum placed upon refinery gas by any local governmental subdivision or school board under any authority or grant of power to levy and collect sales or use taxes."
Id. at 1326. We held that the 1985 amendment, adding refinery gas to the subsection (4)(a)(vii) exemption along with natural gas, provided an exemption for refinery gas when used for any taxable purpose other than when used for boiler fuel. Id. at 1332. We further held that "subsection 305(4)(a)(viii), the later provision, merely excluded refinery gas from the exemption of energy sources used as boiler fuel." Id. (emphasis added). We recognized that while "[t]he Legislature in 1985 arguably intended to keep refinery gas subject to sales and use taxes when it amended the original bill," "the final bill clearly did not achieve that objective." Id. This holding was based on the fact that "[n]othing in the 1985 Act removed Subsection 305(4)(a)(vii)'s general exemption of refinery gas when that property is used for purposes other than as boiler fuel." Id. Accordingly, we affirmed the portion of the trial court judgment which exempted refinery gas when used for purposes other than as boiler fuel between July 6, 1985 and July 18, 1990, denied the energy sources exemption for BP's use of refinery gas and remanded the case to the trial court "to determine the *828 value of taxable refinery gas in accordance with La.Rev.Stat. 47:305D(1)(h)." Id. at 1332, 1334.
The Department points to footnote 6 in the original BP Oil I decision for support of its position that La. R.S. 47:305D(1)(h) created a value-based exemption for refinery gas to the extent that the value of refinery gas exceeds the 52 cent formula. In footnote 6, we were explaining why La. R.S. 47:305D(1)(h) did not violate the Origination Clause. We explained that "Act 258 was not a revenue raising bill, but rather adopted a partial exemption from an existing tax and established the method of valuing the non-exempt portion, which was difficult to value because it was not purchased by the refiner or sold on the open market." Id. at 1328, n. 6. When viewed in light of our discussion in BP Oil I of the legislative history of Act 258, wherein we explained that prior to that Act all refinery gas was taxable when used for any purpose, and that after the 1985 amendment, refinery gas used for purposes other than boiler fuel was exempt, it is clear that our reference to a "an existing tax" referred to an existing tax on all refinery gas, and the "partial exemption" was the exemption for refinery gas when used for any taxable purpose other than for boiler fuel. The "non-exempt portion," refinery gas used for boiler fuel, was valued according to the 52 cent formula because it was "difficult to value because it was not purchased by the refiner or sold on the open market." This reading of the BP Oil I decision is further bolstered by the fact that throughout the opinion we referred to the 52 cent formula as a valuation provision, not an exemption, and we remanded the refinery gas issue to the trial court to set the value according to that formula.
Further legislative history is also telling. Senate Concurrent Resolution No. 58 of the 1990 Regular Session explained the purpose of Act 258 of the 1985 Regular Session. Resolution 58 referred to the "dispute over whether all refinery gas ... is subject to sales and use taxes" and the 1972 administrative resolution to the dispute which fixed the value at four cents per thousand cubic feet. The Resolution further explained that the administrative resolution was "modified effective January 1, 1985 to take into consideration the current value of such refinery gas and fixed the value of refinery waste gas at fifty-two cents per thousand cubic feet for sales and use tax purposes, subject to annual adjustment; ..." Finally, the Legislature expressly "declare[d] its intention in enacting Act No. 258 ... was to put into effect the agreement reached by the state and the refining industry establishing that all refinery gas, including refinery gas used as boiler fuel, shall be subject to sales and use tax ... provided that its taxable value is fifty-two cents per thousand cubic feet, subject to annual adjustment as provided in the Act." Had the legislature intended the 52 cent formula to be a value-based exemption, they could have easily said so in this Resolution adopted expressly for the purpose of spelling out the legislative intent behind the statute. Furthermore, the 52 cent formula is "subject to annual adjustment;" therefore, if the legislature believes the 52 cent formula does not reflect the cost price, it can adjust the formula upward or downward.
Further support for the interpretation that La. R.S. 305D(1)(h) does not provide an exemption for refinery gas is the Department's interpretation of the statute. "A long settled contemporaneous construction by those charged with administering the statute is given substantial and often decisive weight in its interpretation." Traigle v. PPG Industries, Inc., 332 So.2d 777, 782 (La.1976). It is undisputed that from the enactment of the 52 cent formula in 1985 until March of 1995, the Department considered the 52 cent formula to be a valuation provision and considered it to be unaffected by suspensions of exemptions. In addition, the Department advised taxpayers during that time period to use the 52 cent formula to calculate the use tax for refinery gas. It was not until April of 1995 upon advice of outside counsel that the Department began to claim that refinery gas was exempt to the extent that its value exceeded the 52 cent formula. Because the clear language of the statute excepts refinery gas from the energy sources exemption, the legislative history indicates that the 52 cent formula was not a value-based exemption and the Department itself contemporaneously interpreted the statute as a valuation provision *829 unaffected by the legislative suspensions, we hold that La. R.S. 47:305D(1)(h) is not a value-based exemption which was suspended by the legislature.[5] The 52 cent formula sets the value at which refinery gas can be taxed for the periods in question.[6] Accordingly, the court of appeal's decision in Star regarding this issue is affirmed and the court of appeal's decision in BP, which has since been overruled, is reversed.

B. Coke-on-catalyst
We also held in BP Oil I that the reprocessing exclusion found in La. R.S. 47:301(10)(c)[7] did not apply to refinery gas and coke-on-catalyst because they were not part of the crude oil, but were rather by-products of the refining of crude oil which BP ultimately consumed as an energy source. BP Oil I, supra at 1330. We further held that coke-on-catalyst, when used for boiler fuel, was exempt from local use tax under La. R.S. 47:305D(1)(h) and remanded the valuation of the coke-on-catalyst to the trial court. Id. at 1331. On rehearing, we amended our judgment on original hearing "to hold that the valuation method used by the Plaquemines Parish Government was invalid[8] and to direct the trial court on remand to value the coke-on-catalyst in accordance with La.Rev.Stat. 47:306-318."[9]Id. at 1338.
Accordingly, precedent establishes that the use of coke-on-catalyst is a taxable event, not subject to the reprocessing exclusion and that it is exempt under the energy sources exemption. Because the energy sources exemption is suspended, the issue in these consolidated cases is the taxable value of coke-on-catalyst, an issue that was not decided in BP Oil I.[10]
La. R.S. 47:302A provides that use taxes can be imposed on the use of tangible personal property based on a percentage of the "cost price" of the property.
"Cost price" is defined by statute as follows:
"Cost price" means the actual cost of the articles of tangible personal property[11] *830 without any deductions therefrom on account of the cost of materials used, labor, or service cost, except those service costs for installing the articles of tangible personal property if such cost is separately billed to the customer at the time of installation, transportation charges, or any other expenses whatsoever, or the reasonable market value of the tangible personal property at the time it becomes susceptible to the use tax, whichever is less.

La. R.S. 47:301(3)(a) (emphasis added).
After BP Oil I, the Department for the first time began to attempt to collect use taxes on coke-on-catalyst. However, realizing the difficulties of calculating the cost price of this item which was not bought or sold but was instead a by-product of crude oil which was then used as an energy source, the Department issued Sales Tax Administration No. 70.17, effective September 6, 1994, which provided in pertinent part:
Because of the complexities involved in calculating all of the cost components that must be included in the "cost price" of each use of coke-on-catalyst, the department will allow the taxable "cost price" of coke-on-catalyst to be determined by the use of the formula provided by R.S. 47:305(D)(1)(h) which is used in determining the taxable value of refinery gas. Under that formula, the taxable value of refinery gas for each calendar year shall be 52 cents per thousand cubic feet (MCF), multiplied by a fraction, .... Because an MCF of refinery gas has been determined to have a value approximately four times greater than the value of a ton of coke-on-catalyst, the value of coke-on-catalyst will be one-fourth of the amount determined under the refinery gas formula.
The Department has since changed its position and in the these two consolidated cases claims that coke-on-catalyst is to be taxed at the same value as natural gas based on the Department's Regulation 4301, which provides that "[t]he reasonable market value of tangible personal property is the amount a willing seller would receive from a willing buyer in an arms-length transaction of similar property at or near the location of the property being valued." The Department presented evidence that both coke-on-catalyst and natural gas provide heat to the reactor in the catalytic cracking unit. The Department claims that this makes natural gas "similar property at or near the location of the property being valued."
Star and BP claim that Regulation 4301 is invalid under La. R.S. 47:1510[12] as it is "inconsistent" with La. R.S. 47:301(3)(a), which defines cost price according to the reasonable market value of the actual tangible personal property at the time it becomes susceptible to the use tax, not similar property. Star and BP claim that coke-on-catalyst has no reasonable market value, and that in any event, it is not at all similar to natural gas. The catalytic cracker is designed to consume the coke-on-catalyst within minutes of its production and burning the coke off the catalyst is the only economically feasible method of separating the coke from the catalyst, therefore there is no third-party market for coke-on-catalyst.
The Department claims that a use tax is nonetheless owed by a manufacturer who produces and consumes its own product in Louisiana. This is based on La. R.S. 47:301(4) which defines a "dealer" to include "every person who manufactures or produces tangible personal property for sale at retail, for use, or consumption, or distribution, or for storage to be used or consumed in this state...." The Department Regulation explaining "dealer," LAC 61:61:4301.4, para. 3 provides:
Rev. Stat. 47:301(4) includes a dealer every person who manufactures or produces tangible personal property for sale at retail, use, consumption, distribution or for storage to be used or consumed in this state. Thus, the firm which manufactures or produces a product used or consumed by it in the conduct of its business becomes a dealer for sales and use tax purposes, even though none of that particular product is offered for sale.
*831 We agree with the Department's argument that no third-party sale is necessary to determine cost price under the statute. As we held in BP Oil I, "[i]f BP had taken a refined product that it otherwise would have sold and used the product as fuel in the refining process, then the use of that product certainly would have been taxable. We see no reason for different treatment of BP's use of a refinery by-product as fuel in the refining process." BP Oil I, supra at 1330-1331, n. 12. However, the statute does require that the property have a reasonable market value and the Department produced no evidence of the reasonable market value of coke-on-catalyst. In addition, in BP Oil I, we rejected using the cost price of the raw material, crude oil, for use tax purposes, which would be greater than a reasonable market value of zero in any event. To the extent that the tax regulation attempts to tax tangible personal property based on the value of "similar property," that regulation is inconsistent with La. R.S. 47:301 and thus invalid under La. R.S. 47:1511. Furthermore, use tax and sales tax are complimentary in that property sold or used must be subject to a uniform tax burden. See Pensacola Const. Co. v. McNamara, 558 So.2d 231 (La.1990). If the coke-on-catalyst could be sold, it would be taxed based on its sales price, not the sales price of natural gas.
As stated by the court of appeal in Star, "[i]n order to tax Star Enterprises' use of coke-on-catalyst the legislature must enact additional legislation. Coke-on-catalyst is beyond the reach of market value taxation because it has no market value." Star, supra at p. 16, ___ So.2d ___. Instead of enacting additional legislation to tax coke-on-catalyst, the legislature enacted La. R.S. 47:301(18)(d)(ii) by Act 29 of the 1996 Regular Session which excludes coke-on-catalyst from use taxes. If the coke-on-catalyst is actually sold to another person, it is to be taxed according to a method provided in La. R.S. 47:301(13)(d).
Accordingly, we affirm the court of appeal's holding in Star that coke-on-catalyst is not subject to use taxes because it has no reasonable market value. We likewise reverse the court of appeal's holding in BP, which has since been overruled by the court of appeal in Star[13], that coke-on-catalyst be taxed at the same value as natural gas.

C. Other issues
BP has asserted other assignments of error, including the trial court award of 10% attorney fees under La. R.S. 47:1512 without allowing BP to challenge the reasonableness of the fees. Because BP does not owe the additional taxes on refinery gas or coke-on-catalyst that the Department sought in this lawsuit, BP does not owe attorney fees under La. R.S. 47:1512.[14]

DECREE
For the foregoing reasons, the court of appeal's decision in BP is reversed and judgment is entered dismissing the plaintiff's case. The court of appeal's decision in Star is affirmed and judgment is entered dismissing plaintiff's case.[15]
*832 96-C-0716 REVERSED; CASE DISMISSED.
96-C-2218 AFFIRMED; CASE DISMISSED.
CALOGERO, C.J., additionally concurs and assigns reasons.
WATSON, J., concurs as to refinery gas, but dissents as to coke-on-catalyst and will assign reasons.
LEMMON, J., concurs in part and assigns reasons.
KIMBALL, J., concurs in result only and assigns reasons.
CALOGERO, Chief Justice, concurring.
I agree with the majority that coke-on-catalyst has no reasonable market value, but for reasons that are somewhat different than those expressed by the majority, as discussed hereinafter.
In BP Oil Company v. Plaquemines Parish Government, 93-1109 (La.9/06/94), 651 So.2d 1322 ("BP Oil I"),[1] this Court determined that coke-on-catalyst, when consumed by a refinery as an energy source, is subject to a use tax.[2] By an "order amending decision on denial of rehearing" in BP Oil I, this Court remanded to the district court, instructing that court to determine the taxable value of coke-on-catalyst in accordance with LSA-RS 47:301 through 318. Id. at 1336. Thus, although this Court in BP Oil I concluded that the refinery's consumption of coke-on-catalyst as an energy source was a taxable event, this Court expressed no opinion as to its taxable value.
To resolve the question of what the taxable value of coke-on-catalyst is in the consolidated cases before us, we must first look to LSA-RS 47:302(A)(2), which reads as follows:
A. There is hereby levied a tax upon the sale at retail, the use, the consumption, the distribution, and the storage for use or consumption in this state, of each item or article of tangible personal property, as defined herein, the levy of said tax to be as follows:
(2) At the rate of two per centum (2%) of the cost price of each item or article of tangible personal property when the same is not sold but is used, consumed, distributed, or stored for use or consumption in this state; provided there shall be no duplication of the tax.
LA.REV.STAT. ANN. § 47:302 (West 1990). Thus, LSA-RS 47:302(A)(2) requires that the amount of the use tax be calculated as a percentage of the "cost price" of the tangible personal property. "Cost price" is defined in LSA-RS 47:301(3)(a) as the lesser of the "actual cost" or the "reasonable market value" of the tangible personal property. Id. § :301(3)(a). Therefore, in order to determine the taxable value of coke-on-catalyst, both its "actual cost" and its "reasonable market value" must be determined.
Actual Cost.[3] The "actual cost" of coke-on-catalyst can be ascertained by reference to, on a proportionate basis, the actual cost of the raw material from which it is produced: *833 crude oil.[4] As recognized by this Court in BP Oil I, coke-on-catalyst is a by-product of the process of refining crude oil. Coke-on-catalyst is a solid, and crude oil is a liquid. Thus, to determine the actual cost of coke-on-catalyst on a proportionate basis to the crude oil from which it was produced, the amount of coke-on-catalyst used by the refinery must be converted to the fuel oil equivalent barrels ("FOEBs") of crude oil, which is accomplished as follows: Both crude oil and coke-on-catalyst produce BTUs when burned. On average, crude oil has about 6 million BTUs per barrel. Thus, to determine the FOEBs of crude oil to the coke-on-catalyst used by the refinery, the total BTUs of coke-on-catalyst used by the refinery for a given period of time must be divided by 6 million to convert the coke-on-catalyst BTUs to FOEBs of crude oil. Finally, the number of FOEBs of crude oil is multiplied by the price of a barrel of crude oil, valued at the time of the purchase of the crude oil from which the coke-on-catalyst was produced. The result is the actual cost of coke-on-catalyst.[5] As noted above, however, "actual cost" of the coke-on-catalyst is but part of the equation for determining the "cost price" of coke-on-catalyst. The "reasonable market value" must also be determined, as earlier noted, for the statute calculates the use tax as a percentage of the "cost price," which, in turn, is defined as the lesser of "actual cost" or "reasonable market value."
Reasonable Market Value. Although LSA-RS 47:301(3)(a) directs us to determine the "reasonable market value" of the tangible personal property to be taxed, the statute gives no guidance as to the proper method of determining the reasonable market value. The Department of Revenue and Taxation has promulgated, in accordance with the Administrative Procedures Act, Rule 4301, which reads, in pertinent part, as follows:
[T]he reasonable market value of tangible personal property is the amount a willing seller would receive from a willing buyer in an arms-length exchange of similar property at or near the location of the property being valued. The amount which would be realized from a "forced" sale is not acceptable as the market value for this purpose.
LA. ADMIN. CODE tit. 61, § I.4301(3) (1987).
Both district courts in the consolidated cases before us applied the above quoted definition in Rule 4301 and concluded that the reasonable market value of coke-on-catalyst was the readily ascertainable value of natural gas on an energy equivalent basis, finding that natural gas was a "similar property" to coke-on-catalyst. The majority concludes that "[t]o the extent that the tax regulation [Rule 4301] attempts to tax tangible personal property based on the value of `similar property,' that regulation is inconsistent with La. R.S. 47:301 and thus invalid under La. R.S. 47:1511." Op. at 831-832. For the reasons that follow, I believe that it is not necessary to reach Rule 4301 to conclude that coke-on-catalyst has no reasonable market value.
Like the majority, I agree that no actual sale is necessary to determine reasonable market value for the purpose of assessing a *834 use tax.[6] However, I believe that the existence ofor, at the very least, the possibility ofan actual market for the property to be taxed is a necessary prerequisite to determining a property's reasonable market value. An actual market is one where there is a demand for a marketable product, that is, a product that one person would be willing and able to sell to another. The words "reasonable market value," as they are commonly understood, presuppose the existence of a market for the property at issue.
In the instant cases, the evidence is uncontroverted that there is at present no actual market for coke-on-catalyst. Moreover, there is substantial evidence in the record to support the proposition that it would be technologically impossible to create an actual market for coke-on-catalyst, as there is no known method to separate the coke-on-catalyst from the catalyst other than by burning it off of the catalyst and, in that process, consuming it.[7] The State presented no evidence to suggest otherwise.
Rather, the State argues that coke-on-catalyst has a reasonable market value because the refinery creates its own market. Such an interpretation strains the words "reasonable market value" beyond their "generally prevailing meaning" and ignores the well-settled principle that any ambiguity in a tax statute is to be liberally construed in favor of the taxpayer. See Tarver v. E.I. Du Pont De Nemours & Co., 93-1005 (La.3/24/94), 634 So.2d 356, 358; Cox Cable New Orleans v. City of New Orleans, 624 So.2d 890, 895 (La.1993); McNamara v. Central Marine Serv., 507 So.2d 207, 208 (La.1987); see also LA. CIV.CODE ANN. art. 11 (West 1993). It is simply illogical to assert that there is a market for the sale of a property to a "willing buyer" under circumstances in which the property, due to technological and economical constraints, can only be consumed by its manufacturer. Thus, it must follow that a property cannot be found to have a reasonable market value where no market doesor even canexist.
Accordingly, because there is no current (nor, at least on this record, possible) actual market for coke-on-catalyst, I agree with the majority that coke-on-catalyst has no reasonable market value. Further, because the relevant statute directs us to use only the lesser of actual cost or reasonable market value as the "cost price" of the tangible personal property to be taxed, coke-on-catalyst, having a reasonable market value of zero, has no taxable value for use tax purposes. Of course, the legislature, if it so chooses, can amend the appropriate taxing statute to provide a statutory valuation formula for coke-on-catalyst or amend the definition of "cost price" to permit greater leeway in valuing coke-on-catalyst for use tax purposes.[8]
For the reasons given above, I respectfully concur.
LEMMON, Justice, concurring in part.
While coke-on-catalyst clearly has substantial value, the State failed to prove any reasonable *835 market value for this by-product by failing to show either an actual market or the possibility of an actual market.[1]
KIMBALL, Justice, concurring in result only.
I concur in the majority's determination that La. R.S. 47:305(D)(1)(h) is a valuation provision and not an exemption, such that refinery gas may only be taxed at the value specified in that statute. However, due to the particular factual circumstances existing in these cases, I concur only in the result reached by the majority regarding the taxation of coke-on-catalyst.
Both the majority and concurring opinion acknowledge that this court determined coke-on-catalyst, when consumed by a refinery as an energy source, is subject to a use tax. Ante at 829-830, concurring opinion at 832-833; see also BP Oil Company v. Plaquemines Parish Government, 93-1109 (La.9/06/94), 651 So.2d 1322; La. R.S. 47:302. However, despite the fact that this court has previously determined the consumption by refineries of coke-on-catalyst for energy production purposes constitutes a taxable event, both the majority and the concurring opinion conclude, for different reasons, that coke-on-catalyst has no taxable value for use tax purposes under the applicable statutory and regulatory scheme. In my view, both the majority and the concurring opinion err in this conclusion.
La. R.S. 47:302A provides that use taxes can be imposed on the use of tangible personal property based on the "cost price" of the property. La. R.S. 47:301(3)(a), in pertinent part, defines "cost price" as "the actual cost of the articles of tangible personal property..., or the reasonable market value of the tangible personal property at the time it becomes susceptible to the use tax, whichever is less." The Department, in accordance with the Administrative Procedures Act, has, in Regulation 4301, construed "reasonable market value," as that phrase is used in the statute, to mean "the amount a willing seller would receive from a willing buyer in an arms-length exchange of similar property at or near the location of the property being valued." La. Admin. Code 61:I.4301(3). Contrary to the majority, I do not find the definition of "reasonable market value" contained in Regulation 4301 to be inconsistent with La. R.S. 47:301(3)(a).[1] In my view, the regulation does not, as the majority asserts, attempt to "tax tangible personal property based on the value of `similar property.'" Ante at 831. Instead, Regulation 4301 employs a method long accepted in other valuation contexts to determine the reasonable market value of property upon which a tax has been levied by statute. In fact, in other contexts, such as an expropriation, this court has not only upheld, but strongly advocated the use of "comparables," i.e., what a willing buyer would pay a willing seller for similar property, as the proper method for the determination of the "fair market value" of the property being expropriated. See, e.g., West Jefferson Levee District v. Coast Quality Constr. Corp., 93-1718, pp. 15-16 n. 23 (La.5/23/94), 640 So.2d 1258, 1272, and cases cited therein. In my view, no significant distinctions between "reasonable market value" and "fair market value" exist. Instead, the legislature's use of "reasonable" as opposed to "fair" indicates nothing more than an acknowledgment by the legislature that the cost price of property for use tax purposes might well have to be determined in the absence of an actual market. There is, therefore, no valid reason for discarding this method of determining the "reasonable market value" of coke-on-catalyst as inconsistent with La. R.S. 47:301(3)(a)'s requirement that the use tax be levied upon the "reasonable market value of the tangible personal property at the time it becomes susceptible to the use tax," when we have long held the "fair market value" of expropriated property is determined through examination of comparable properties. In essence, the majority's reasoning leads to the absurd result of the *836 Department's Regulation being declared invalid for following a methodology for determining the "reasonable market value" of property long accepted by this court. With such reasoning I cannot agree.
Having erroneously and unnecessarily invalidated the Department's Regulation, the majority declares "the Department produced no evidence of the reasonable market value of coke-on-catalyst." Ante at 831.[2] However, while the trial courts' determinations of the reasonable market value of coke-on-catalyst are clearly wrong such that the Department in these particular cases may be held to have failed to prove, as it is required to do, the reasonable market value of coke-on-catalyst, the majority has gone much further and decided "coke-on-catalyst is not subject to use taxes because it has no reasonable market value." Ante at 831. In my view, there is a great deal of difference between deciding the trial courts' valuations are erroneous such that the Department failed to prove the reasonable market value of coke-on-catalyst in these particular cases and both the majority and concurring opinion's determinations that, under the applicable statutes and regulations, coke-on-catalyst has and, more importantly, can have, no reasonable market value.
The Department has the burden in these cases of producing evidence of the "reasonable market value" of coke-on-catalyst. Once the Department has done so, the taxpayer, should he believe the Department's "reasonable market value" to be too high, has the burden of proving a lower value. In the instant cases, the Department acquiesced in these taxpayers' assertions that the "actual cost" of coke-on-catalyst is far higher than its "reasonable market value." However, the Department then proved to the satisfaction of these trial courts that the reasonable market value of coke-on-catalyst is natural gas on an energy equivalent basis. In my view, these determinations are clearly wrong. According to the evidence adduced, natural gas is the ideal fuel for these refiners. In contrast, the evidence shows coke-on-catalyst suffers from several problems not associated with the use of natural gas. The failure to account for these differences in determining the reasonable market value of coke-on-catalyst is no different than a failure to adjust the value of property being valued in an expropriation case to reflect differences in the "comparables" by which it is being valued, and renders the trial courts' determinations in these cases manifestly erroneous. As such, the majority should have conducted a de novo review of the record evidence to determine whether the Department had adduced *837 other evidence sufficient for this court to determine the reasonable market value of coke-on-catalyst instead of erroneously declaring coke-on-catalyst simply has, and can have, no reasonable market value.
Therefore, though I would hold the trial courts' determinations of the "reasonable market value" of coke-on-catalyst in these particular cases is manifestly erroneous, I would not, as the majority and concurring opinions do, hold that coke-on-catalyst has, and can have, no reasonable market value whatsoever.
NOTES
[*] Marcus, J., not on panel. Rule IV, § 3.
[2] L.S. 47:305D(1)(h) was amended and reenacted by Act No. 29 of the 1996 Regular Session and now reads: "(h) All energy sources when used for boiler fuel except refinery gas." The 52 cent formula is now included as the definition of the "cost price" of refinery gas under La. R.S. 47:301(3)(f), enacted by Act No. 29 of the 1996 Regular Session.
[3] La. Const. art. VI, Sec. 29(A) grants local governments the authority to levy and collect sales and use taxes, without legislative authorization, as long as the total sales and use taxes do not exceed three percent.
[4] La. Const. Art. III, Sec. 16(B), the "Origination Clause," requires all bills for raising revenue or appropriating money to originate in the House of Representatives.
[5] The Department points to our decision in Hibernia Nat. Bank v. La. Tax Comm'n, 195 La. 43, 196 So. 15 (La.1940) for the proposition that any statute which creates a tax immunity for a portion of a good's value is a tax exemption. In that case, the legislature was prohibited by the Constitution of 1921 from granting tax exemption, except those expressly allowed by the Constitution, and attempted to do so by making an ad valorem tax only applicable to the excess surplus, undivided profits and contingent reserves over and above the par value of common stock. This was contrary to the Constitution of 1921 which listed the specific property that could be exempt from taxation and provided that shares of bank stock, surplus, undivided profits and contingent reserves were not exempt. We held that this valuation was in effect an exemption of the value of the stock up to the par value which was strictly prohibited by the Constitution. If we held otherwise, the exemption clause of the Constitution would place "no limitation upon the power and authority of the Legislature to exempt property from taxation." Id., 195 La. at 65, 196 So. 15.

In Hibernia, the legislature was prohibited from granting the exemption and attempted to do so by placing a lower value on the stock to be taxed. To the contrary, in this case, the legislature is free to grant an exemption but has not done so, and is free to set the cost price of a good, which it has chosen to do. The Hibernia case is therefore not dispositive.
[6] In the case of BP, the period in question is from December 1, 1990 through July 20, 1995 and in the case of Star, the period in question is from January 1, 1992 through April 20, 1995.
[7] Prior to the 1995 amendment, La. R.S. 47:301(10)(c) provided that "[t]he term `sale at retail' does not include the sale of materials for further processing into articles of tangible personal property for sale at retail...."
[8] The valuation method used by the parish according to the parish ordinance was to value coke-on-catalyst at its actual cost, based on crude oil prices.
[9] At the beginning of the rehearing opinion, we directed the trial court to value the coke-on-catalyst according to La. R.S. 47:301-318. The citation in the decree to La. R.S. 47:306-318 rather than La. R.S. 47:301-318 was an inadvertent error.
[10] By Act 29 of the 1996 Regular Session, the legislature has enacted La. R.S. 47:301(18)(d)(ii) which excludes the use of coke-on-catalyst from use taxes but which also specially states that coke-on-catalyst can be taxed if it is actually sold to a third party.
[11] "`Tangible personal property' means and includes personal property which may be seen, weighed, measured, felt or touched, or is in any other manner perceptible to the senses." La. R.S. 47:301(16)(a).
[12] La. R.S. 47:1511 gives the department the authority to promulgate rules and regulations in order to administer and enforce the tax statutes but the rules and regulations "shall not be inconsistent with the provisions of this Sub-title or other laws or the constitution of this state."
[13] The Fourth Circuit overruled the BP case in Star by polling all of the judges on the court. Nevertheless, the State prevailed in BP, and we must, therefore, reverse the BP decision by the court of appeal.
[14] BP has also asserted that the court of appeal failed to consider BP's argument that the tax claims for the period from December 1, 1990 through December 1, 1991 had prescribed. The trial court rejected this argument and granted the Department a judgment for use taxes during this period. Because we hold that BP only owes taxes on refinery gas at the 52 cent formula and does not owe taxes on coke-on-catalyst and BP paid taxes on this basis from December 1, 1990 through December 1, 1991, we need not reach this prescription argument.

BP's last assignment of error is that the trial court's decision regarding the cost price of refinery gas and coke-on-catalyst should be applied prospectively only. Because of our holding, this issue is moot.
The Department in the Star case assigned as error the court of appeal's ruling that because the trial court did not have jurisdiction to render the September 19, 1995 judgment, that judgment was null. This issue is moot because we have affirmed the court of appeal's holding that refinery gas is taxable at the 52 cent formula and that coke-on-catalyst has no "cost price" within the meaning of La. R.S 47:301(3).
[15] Several motions were referred to the merits and we decide these as follows: Star's motion to strike references by the Department to documents and other material not in the record on appeal is granted; the Parish of East Baton Rouge's motion for leave to file a supplemental amicus curiae brief is denied; Star's motion for leave to file a response to an amicus curiae brief is denied; and Star's motion to supplement the record on appeal is denied.
[1] Pursuant to Rule IV, Part 2, § 3, Chief Justice Calogero was not on panel in BP Oil I.
[2] LSA-RS 47:302 levies a tax upon the sale, use, or consumption of tangible personal property in Louisiana. LA.REV.STAT. ANN. § 47:302 (West 1990). "Tangible personal property" is defined as "personal property which may be seen, weighed, measured, felt or touched, or is in any other manner perceptible to the senses." Id. § :301(16). Coke-on-catalyst, a solid by-product of the crude oil refining process, is "tangible personal property" and is, thus, taxable, unless exempted from taxation by statute. No such exemption is applicable in the instant cases.
[3] In this section of my concurrence, I express my view of how the "actual cost" of coke-on-catalyst could be calculated. In doing so, I am cognizant of the fact that this discussion is essentially dicta, as the majority and I reach the conclusion that the use of coke-on-catalyst is beyond taxation because it has no reasonable market value. Nonetheless, given that this is a concurring opinion, I include this discussion of the actual cost because it expresses my view.
[4] Mobil Oil Corp. v. Johnson, 93 Ill.2d 126, 66 Ill.Dec. 285, 442 N.E.2d 846 (1982) is the only reported decision from another state to address the issue of determining the actual cost of coke-on-catalyst for the purpose of assessing use taxes. Therein, the Illinois Supreme Court concluded that the price of crude oil from which the coke-on-catalyst was produced was the proper basis upon which to calculate the actual cost of coke-on-catalyst.
[5] An illustration of the formula given above is as follows: If the refinery used 27 million BTUs of coke-on-catalyst over a given period of time, the first step would be to divide the 27 million BTUs of coke-on-catalyst by 6 million, the number of BTUs in a barrel of crude oil, to determine the number of fuel oil equivalent barrels ("FOEBs") of crude oil. In this example, the result would be 4.5 FOEBs of crude oil (27 million divided by 6 million). In other words, 4.5 barrels of crude oil would contain the same number of BTUs as the coke-on-catalyst used by the refinery in this example. To determine the actual cost of the coke-on-catalyst used in dollars, simply multiply the number of FOEBs of crude oil, in this example 4.5, to the actual cost of a single barrel of crude oil. For example, if the actual cost of a single barrel of crude oil was $30.00, then the actual cost of the coke-on catalyst used by the refinery would be $135.00 (4.5 multiplied by $30.00).
[6] In fact, a use tax is imposed only in the absence of an actual sale. If an actual sale did exist, then a sales tax, rather than a use tax, would be at issue.
[7] The physical characteristics of coke-on-catalyst make it impractical, if not impossible, to extract it from the catalyst in order to sell it as a fuel to another party. As noted above, coke-on-catalyst is a by-product of the crude oil refining process that consists of very fine thread-like filaments. The catalyst consists of very fine, distinct particles in a powder-like form. In the catalytic cracking unit, coke-on-catalyst is formed inside the tiny pores of the catalyst. To further complicate attempts to extract the coke-on-catalyst, only a minute amount of coke-on-catalyst is disbursed over a very large surface area of the catalyst. For example, the catalyst may have a surface area of a hundred square meters with only five-hundredths of a gramabout a dropof coke-on-catalyst spread out over that enormous surface. Moreover, the life span of coke-on-catalyst, from its creation to its consumption, is but five to seven minutes.
[8] By our assessmentthe majority's and mine, there is admittedly a void: a tangible substance, the use of which, in theory, creates a taxable event, yet because of the present statutory method for valuing it, is beyond taxation. This void, however, can only be filled by the legislature, as suggested above. Of interest, the only change that the legislature did make, concerning the taxing of coke-on-catalyst following this Court's decision in BP Oil I and the commencement of the instant suits, was to prospectively exclude coke-on-catalyst from use taxes. See 1996 La. Sess. Law Serv. 444 (West) (to be codified at LSA-RS 47:301(18)(d)(ii)).
[1] The statutory definition of "cost price" is the lesser of "actual cost" or "reasonable market value."
[1] The concurring opinion asserts that "it is not necessary to reach Rule 4301 to conclude that coke-on-catalyst has no reasonable market value." Concurring opinion at 833. For reasons discussed infra, I disagree.
[2] The concurring opinion correctly notes there is no "actual market" for coke-on-catalyst, and then incorrectly relies on this state of affairs to conclude:

It is simply illogical to assert that there is a market for the sale of a property to a `willing buyer' under circumstances in which the property, due to technological and economical constraints, can only be consumed by its manufacturer. Thus, it must follow that a property cannot be found to have a reasonable market value where no market doesor even can exist. Accordingly, because there is no current (nor, at least on this record, possible) actual market for coke-on-catalyst, I agree with the majority that coke-on-catalyst has no reasonable market value.
Concurring opinion at 834. However, as explained supra, the "willing buyer" formulation is nothing more than an expression of a methodology employed to determine the value of property, such as coke-on-catalyst, for which no market exists. Clearly, an actual market exists for energy. In this regard, I doubt anyone would dispute the fact that if a refiner used the coke-on-catalyst to generate steam and spin a turbine to produce electricity, the refiner's consumption of that electricity would be taxed. The only difference between that use of coke-on-catalyst and the use to which these refiners have actually put coke-on-catalyst is that coke-on-catalyst, until it is converted into measurable energy units, is difficult to value. It is, therefore, not at all "illogical" to determine the reasonable market value of coke-on-catalyst by comparing it to other energy sources, taking into account, much as is done with "comparables" in the appraisal of real estate for expropriation purposes, the differences between the various sources of equivalent amounts of energy to derive the relative value of each type of energy source. This, in fact, is what the "free market" does every day to determine the relative values of the various forms of energy available to consumers. As such, it is simply not necessary for an actual, or even possible market to exist for coke-on-catalyst to have a use tax value to the consuming refiner or to be valued under the "reasonable market value" formulation, and it certainly does not, as the concurring opinion asserts, follow that because an actual market does not exist, coke-on-catalyst has no reasonable market value.