Dear Senator Duplessis:
You have requested an opinion of this office regarding the status of the Ernest N. Morial-New Orleans Exhibition Hall Authority ("Authority") as a "local depositing authority" pursuant to the provisions of LSA-R.S. 39:1211-1235. Specifically, you ask whether the Authority is a local depositing authority as that term is defined in R.S. 39:1211 and, if so, whether the provisions of R.S. 39:1233.1, which provides for recusal in certain matters by an appointed member of a local depositing authority who is serving as an officer, director, or employee of any national or state bank, is applicable to the board of commissioners of the Ernest N. Morial-New Orleans Exhibition Hall Authority.
The Authority was created pursuant to Act 305 of the 1978 Regular Session of the Louisiana Legislature (Act 305). The governing body of the Authority consists of eleven appointed Board members. The Authority was granted all powers necessary and incidental to the acquisition, construction, reconstruction, extension, improvement, operation, and maintenance of a convention, exhibition and tourist facility. Section 1 of Act 305 states that the Authority "shall be a body politic and corporate and political subdivision of the state of Louisiana. The territorial limits and territorial jurisdiction of said Authority shall be the entire parish of Orleans as the boundaries and limits of said parish are presently fixed by law." Our office has previously opined that the Authority is a political subdivision of the State. See Atty. Gen. Op. Nos. 99-200 and 99-307.
R.S. 39:2211 provides that the term "local depositing authorities", includes "all parishes, municipalities, boards, commissions, sheriffs and tax collectors, judges, clerks of court, and any other public bodies or officers of any parish, municipality or township, but it does not include the state and its elected officials, and state commissions, boards, and other state agencies." Unless otherwise provided by law, state entities that are not considered "local depositing authorities" are mandated by law to deposit their funds with the State Treasurer. *Page 2 
While the statute includes various local public bodies within the definition of a local depositing authority, it expressly excludes the state and its elected officials, and state commissions, boards and other state agencies as a local depositing authority. Therefore, the Authority would be included within the definition of a local depositing authority unless it is a state agency, board or commission.
Our research indicates that the Authority is not a state commission, board or state agency. The Authority is not included in any branch of state government as provided for in Title 36 of the Louisiana Revised Statutes of 1950 and which is referred to as the Executive Reorganization Act. This Act implements Article IV, Section 1 and Article XIV, Section 6 of the state constitution which allocates all offices, boards, commissions, agencies, and instrumentalities of the executive branch of state government, whether constitutional or statutory, into twenty departments.
Under Title 36, agency "means and includes the boards, commissions, departments, agencies, offices, officers, and other instrumentalities, or any or all of these, within the executive branch of state government which are abolished by this Title, or which are transferred and placed within the departments of the state government created and established or continued by this Title or transferred to and placed within the office of the governor as provided by this Title." (LSA-R.S. 36:3(1)). One example of such an inclusion of a state commission, board or agency within Title 36 is the Sabine River Authority (SRA). Act272 of 1990 transferred the Sabine River Authority to the Department of Transportation with the mandate that the SRA "perform and exercise its powers, duties, functions, and responsibilities in the manner provided for agencies transferred in accordance with the provisions of R.S. 36:801.1."
The Ernest N. Morial-New Orleans Exhibition Hall Authority is not included in any of the provisions of the Executive Reorganization Act or other state law that would make the Authority a state board, commission or state agency, and which would exclude the Authority as a local depositing authority under R.S. 39:1211. If not a state agency, board or commission, then the Authority must be considered a political subdivision and unit of local government.
Article VI of the state constitution, entitled Local Government, provides in Section 19 that "Subject to and not inconsistent with this constitution, the legislature by general law or by local or special law may create or authorize the creation of special districts, boards, agencies, commissions, and authorities as it deems proper, including, but not limited to, the power to incur debt and issue bonds."
Article VI, Section 44(2) of the state constitution defines Political Subdivision as a "parish, municipality, and any other unit of local government, including a school board and a special district, authorized by law to perform governmental functions." *Page 3 
Pursuant to the cited constitutional provisions the legislature has clearly established the Ernest N. Morial-New Orleans Exhibition Hall Authority as a political subdivision of the state and unit of local government and not a state board, commission or state agency. As such, the Authority clearly falls within the statutory definition of local depositing authority as that term is used in R.S. 39:1211. Also see Attorney General Opinion No. 92-141 wherein levee districts were found not to be state agencies, boards or commissions, but rather political subdivisions of the state within the local government framework, and thus considered a "local depository authority" in accordance with R.S. 39:1211.
Accordingly, it is the opinion of this office that the Ernest N. Morial-New Orleans Exhibition Hall Authority is a local depositing authority as that term is used in R.S. 39:1211 and that the Authority is subject to the provisions of 39:1211-1235, including the provisions of R.S. 39:1233.1 requiring recusal in certain matters by an appointed member of a local depositing authority who is also serving as an officer, director, or employee of a national or state bank.
We trust this adequately responds to your request. If you have any questions or comments, please do not hesitate to contact our office.
With kindest regards,
Very truly yours,
 CHARLES C. FOTI, JR. ATTORNEY GENERAL
 BY: ______________________ RICHARD L. McGIMSEY Assistant Attorney General *Page 4 
 ATTACHMENT OPINION NUMBER 92-141 47-H Fiscal Agents 63 Levees, Drainage District Flood Control
 LSA-Const. Art. VI, Section 38 LSA-Const. Art. VI, Section 44 R.S. 38:309, 39:1211, 1214, 1215, 1216, 1220 1224; R.S. 49:322, and Article VII, Section 9(C)
 Levee districts are local political subdivisions subject to the local depository laws for purposes of selecting a fiscal agent. Approves form of security pledge for deposit of public funds.
 Levee district must give written notice to all banks in the parish and invite bids for fiscal agency contract.
 Levee district must select banks domiciled or having a branch office in the parish unless district cannot arrive at satisfactory fiscal agency agreement. Safekeeping banks need not be domiciled in Louisiana. but domiciliary banks may be selected if mutually agreed upon by levee district and fiscal agent banks.
 Mr. James A. Burnett Attorney at Law Burnett, Sutton Walker 1400 Youree Drive Shreveport, LA 71101-5197
Dear Mr. Burnett:
Your opinion request to Fred C. Dent, former Commissioner of Financial Institutions, was forwarded to this office for reply. In your capacity as legal advisor to the Caddo Levee District (the District), you have raised several questions relating to the laws applicable to the collateralization of public funds and the selection of a fiscal agent for the District.
Your first two questions relate to the documentation necessary to confect a valid deposit of security under LSA-R.S. 39:1224, which would withstand third party claims, more particularly, claims arising from a bank failure.
You have provided copies of several documents currently being used by the District in connection with the deposit of securities: (1) a solicitation letter, (2) the depository bank's letter to a safekeeping bank, and (3) the corresponding safekeeping receipt. You ask whether it is necessary to prepare additional documents such as a formal act of pledge and an acknowledgment letter by the safekeeping bank to perfect the pledge of security.
For reasons to be discussed, infra, we believe that LSA-R.S.39:1224 is the controlling statute for the deposit of securities for the District. It provides as follows: *Page 5 
 "§ 1224. Security for deposits; authorized depositories
 The bonds, certificates of indebtedness, paving certificates, promissory notes, evidence of participation in promissory notes, and other interest-bearing securities or obligations furnished as security, shall be deposited with the depositing authority or with an unaffiliated bank or trust company or federal reserve bank or any Federal Home Loan Bank or its successor; such security, whether in the hands of the depositing authority or held in safekeeping or trust by any bank, trust company, federal reserve bank or Federal Home Loan Bank or its successor, shall be deemed to be under the control and in the possession of the depositing authority and deemed to be held in its name by the depository bank, trust company, federal reserve bank or Federal Home Loan Bank or its successor. The depository bank or trust company or federal reserve bank must be acceptable to both the depositing authority and the fiscal agent bank, and if these two cannot agree, the commissioner of financial institutions shall designate a depository. Banks or trust companies which are subsidiaries of a bank holding company shall not be considered affiliated for the purpose of this Section."
The adequacy of the documentation necessary to perfect a valid pledge of securities to the end that a depositing authority, whether state or local, has control over same was previously addressed by the Attorney General's Office in opinion numbers 89-559 and 89-559(A). At issue was the custodial practice of an unaffiliated bank serving as the depository for securities pledged as collateral for the deposit of state funds. The safekeeping receipt facially stated "For the account of BUNKIE BANK TRUST CO." Immediately thereunder was the additional notation "PLEDGED TO STATE OF LOUISIANA DEPARTMENT OF THE TREASURER."
In finding the safekeeping receipt defective, the author opined: *Page 6 
 "Whether this safekeeping receipt evidenced custody of securities pledged as collateral for either state, parochial or local funds — that is, regardless of whether R.S. 39:1224 or R.S. 49:322 governed — it does not comply with the requirements of those statutes. The statutory requirements providing for the collateralization of deposited public funds contemplate (1) the pledge of securities of a value equal to 100% of the deposited funds as collateral and (2) the deposit of such securities either with the depositing authority or in a bank or trust company for the account of the public depositing authority.
 These statutes contemplate that the depositing authority have control of the securities, either through actual custody, or through the securities being pledged to the account of the depositing authority.
 The safekeeping receipt does not evidence this necessary control of the securities. It pledges the amount to the account of the bank, and not the depositing authority. This is prohibited by R.S. 49:322."
In a supplemental opinion, the same author reviewed a revised safekeeping receipt from the First National Bank of Commerce. The revised receipt facially provides that the collateral securities are "PLEDGED TO THE ACCOUNT OF [the depositing authority]," rather than the bank. The author concluded that the revised receipt conformed to the requirements of LSA-R.S. 39:1224 and49:322 and approved same as a valid form of security pledge for the deposit of public funds.
Ms. Yvette Rook, State Treasurer's Office, oversees the pledge of securities for the deposit of state funds as per LSA-R.S.49:322. She advised that the State Treasurer has historically considered a safekeeping receipt conforming to Section 322 adequate as to form and leagality as a pledge of security for the deposit of public funds. It should be noted that the safekeeping receipt must also identify the securities being pledged. *Page 7 
Ms. Donna Magee, legal counsel to the Federal Deposit Insurance Corporation in Memphis, advised that, for purposes of bank liquidations, a properly executed safekeeping receipt will shield the depositing authority from third party claims. She confirmed that the safekeeping receipt should identify the securities pledged and state that they are pledged for the account of the depositing authority.
While the formal act of pledge and the acknowledgment letter from the safekeeping bank may not be necessary elements for the efficacy of the pledge of securities, they would certainly strengthen same. As stated above, we believe the local depository law to be applicable to the District. We therefore recommend that the third page of your pledge agreement be revised to reflect delivery of the securities to the depositing authority (i.e., the District), or with an unaffiliated bank or trust company or federal reserve bank or any Federal Home Loan Bank in conformity with the language in LSA-R.S. 39:1224.
We also note that the safekeeping receipt attached to your letter does not conform to the provisions of LSA-R.S. 39:1224 in that it provides that securities are pledged "For the account of Louisiana Bank and Trust Company." We recommend that the receipt be modified to reflect that securities are pledged for the account of the District, and not the bank.
Your third question requests assistance in determining which depository law, state or local, governs the deposit of public funds owned by the District. For the following reasons, we are of the opinion that the District's deposits are governed by the laws relating to local depositories found at LSA-R.S. 39:1211, et seq.
The laws relating to levee districts were amended and reenacted by Act No. 785 of the 1985 Regular Session of the Louisiana Legislature. Prior thereto, Chapter 4 of Title 38 consisted of Parts I through IV, which contained provisions relating to levee districts, generally, and Parts V through XXVI, each of which contained provisions relating to particular levee districts. Act 785 had the general effect of consolidating into a single comprehensive scheme the many parallel provisions relating to particular levee districts.
Before this statutory consolidation, there was no general state provision regarding the deposit of funds for all levee *Page 8 
districts. Each district had its own statute regarding its organization and powers. This is illustrated in Attorney General Opinion No. 77-1518 released on December 19, 1977. It held that the 1974 Constitution did not give districts the right to use local banks as depositories. It cited, by example, LSA-R.S. 38:957 (now repealed), relating to the Fifth Louisiana Levee District, which provided, in pertinent part, the following:
 ". . . All funds of the board shall be deposited with the State Treasurer to the credit of the district, and all warrants drawn thereon by the president of the board shall specify the indebtedness the warrants are intended to liquidate, in part or in whole. The funds shall not be drawn from the treasurer except on the warrants of the president or chairman of the board while acting as president."
The author concluded that the above and other similar statutes requiring district funds to be deposited with the State Treasurer continued in effect. However, the opinion noted that such statutes were subject to future amendment by the Legislature.
Per Act No. 785 of 1985, LSA-R.S. 38:309, now generally governs the deposit of funds by districts. It provides, in pertinent part, the following:
 "All funds of the board may be deposited with the State Treasurer to the credit of the district unless otherwise provided. . . ." (Emphasis added).
As can be seen from the above, what was once a legal mandate for district funds to be deposited with the State Treasurer is now permissive and recognizes options afforded by other depository laws.
Article VI of the Louisiana Constitution of 1974 contains those provisions which govern the creation, functions, powers, and operations of local governmental units. Section 38 of Article VI provides for the retention and creation of levee districts. Article VI, Section 44, the definitional section, defines as a "political subdivision," a special district, such as a levee district. *Page 9 
While the jurisprudence is not uniform, levee districts have been held to be political subdivisions. Commander v. Board ofCommissioners of Buras Levee District 11 So.2d 605 (La. 1942), Rehearing Denied; Musmeci v. American Automobile InsuranceCompany 146 So.2d 496 (La.App. 1962) Rehearing Denied. Further, this office has consistently opined that levee boards are local political subdivisions and political corporations of a local nature, and not state agencies of the Executive Branch of state government. See Attorney General Opinion Nos. 84-75, 83-6, 77-921, and 76-966A.
LSA-R.S. 39:1211 defines "local depositing authorities" to include all parishes, municipalities, boards, commissions, sheriffs and tax collectors, judges, clerks of court, and any other public bodies or officers of any parish, municipality or township, but it does not include the state and its elected officials, and state commissions, boards, and other state agencies.
Since levee districts are not state agencies, commissions, or boards, but rather political subdivisions of the state within the local governmental framework, it is our opinion that they constitute local boards falling squarely within the definition of "local depositing authority" in Section 1211. Read in pari materia with LSA-R.S. 38:309, we are of the opinion that levee district funds are subject to the local depository laws.
Mr. James Blankinship, Fiscal Analyst for the Louisiana Office of State Treasurer, advised that the only levee districts currently depositing funds with the State Treasurer are those very few with outstanding bonds against which the full faith in credit of the state is pledged. See Article VII, Section 9(C) of the Louisiana Constitution of 1974.
Your fourth question asks whether the District is required to solicit proposals or bids for the deposit of its funds. In answer to your question, we draw your attention to LSA-R.S. 39:1214
which provides as follows:
 "§ 1214. Bids to be invited
 Local depositing authorities shall, within 30 days prior to expiration of any contract that may be entered into under this Chapter, *Page 10 
give written notice to each of the banks located in any parish which embraces all or any portion of the political subdivision in which the depositing authority is domiciled and for which it acts, setting forth the intention of the depositing authority to select a fiscal agency. This notice shall specify the time for which the fiscal agency contract shall be made and the conditions and terms of the fiscal agency contract proposed; and it shall invite bids under the terms and conditions of the proposal. A copy of the notice shall be published in the official journal of the depositing authority at least three times, the first notice to be published at least 15 days preceding the date for the selection of the fiscal agency."
As can be gleaned from the above, the District must give written notice to each of the banks located in the parish setting forth the terms and conditions of the contract proposed and an invitation for bids. The District must publish a copy of the notice in its official journal at least three times, the first notice to be published at least 15 days preceding the date for the selection of the fiscal agency.
Your fifth question asks whether the District is required to deposit its monies in a bank domiciled in Louisiana.
As previously discussed, LSA-R.S. 39:1214 requires the District to give written notice to each of the banks located in the parish. Section 1220(A) provides, in pertinent part, the following:
 "A. Local depositing authorities shall, except as otherwise provided in this Chapter, select as the depositories of their funds, a bank domiciled or having a branch office located in the parish or municipality or congressional district of the depositing authority, subject to the following conditions:"
In Tri-Parish Bank and Trust Company et al. v. City of Eunice343 So.2d 1121 (La.App. 3rd Cir. 1977) Writ Refused, the Court *Page 11 
interpreted the provisions contained in LSA-R.S. 39:1214 and 1220. The issue presented was whether the City of Eunice (located in both St. Landry and Acadia Parishes) was required to select as its fiscal agent, a bank which was domiciled in that city or any bank domiciled in either of the parishes. The Court concluded:
 "In our opinion a fair reading of Section 1220, considering it with other pertinent statutory provisions and applying established rules of statutory construction, compels the conclusion that the Legislature intended to provide that a municipality must select as its fiscal agent a bank which is domiciled in that municipality. If the depositing authority is not a municipality, but it is a parish or a political subdivision located wholly within a parish, then it may select as its fiscal agent a bank which is domiciled anywhere in that parish. If the depositing authority is not a municipality, or a parish, or a state official or agency, and its geographical area extends over more than one parish, then we think Section 1220 authorizes it to select as its fiscal agent a bank which is domiciled in the congressional district of the depositing authority."
Based on the rationale in the Tri-Parish case, it is our opinion that LSA-R.S. 39:1220 requires the District to select as its fiscal agent, a bank domiciled or having a branch office located in the parish. The law does afford exceptions to this general rule in LSA-R.S. 39:1215 and 1216. Both sections authorize the consummation of private fiscal agency agreements and supplemental private fiscal agency agreements with banks located either within or without this state, subject to the statutory requirements contained in each section.
Your final question asks whether the safekeeping or unaffiliated bank holding security in the name of the depositing authority must be domiciled in Louisiana. If not, you ask whether the District can require said bank to be domiciled in this state.
In answer to your question, I refer you to LSA-R.S. 39:1224. Prior to its amendment by Act No. 772 of the 1989 Regular *Page 12 
Session of the Louisiana Legislature, Section 1224 required the safekeeping bank to be domiciled within the state. However, with the passage of Act 772, the effective date of which was September 3, 1989, this domiciliary requirement was removed. Section 1224 now provides, in pertinent part, the following:
 "The bonds, certificates of indebtedness, paving certificates, promissory notes, evidence of participation in promissory notes, and other interest-bearing securities or obligations furnished as security, shall be deposited with the depositing authority or with an unaffiliated bank or trust company or federal reserve bank or any Federal Home Loan Bank or its successor;. . . . The depository bank or trust company or federal reserve bank must be acceptable to both the depositing authority and the fiscal agent bank, and, if these two cannot agree, the commissioner of financial institutions shall designate a depository."
We see no legal prohibition against the depositing authority limiting its selection of the safekeeping bank to an institution domiciled in Louisiana as long as the selection is acceptable to the fiscal agent bank. Failure to reach a mutual agreement will result in a selection made by the commissioner of financial institutions.
Trusting this adequately responds to your request, I am
Sincerely,
 RICHARD P. IEYOUB Attorney General
 By: _______________________ ROBERT E. HARROUN, III Assistant Attorney General *Page 13 
 ATTACHMENT OPINION 99-200
 7 Boats-Motorboats Vessels
 61-C Laws-Special Legislation
 119 Taxation-Exemptions, general
 172 Water Water Courses-Boats, Motorboats Vessels
 Articles 9, 10, 11 and 12 of the Louisiana Civil Code
 R.S. 1:3-4
 The Tour Tax imposed by Ordinance of the Ernest N. Morial New Orleans
 Exhibition Hall Authority is not applicable to non-gaming Mississippi River
 cruise boats, the primary purpose of which is to offer an entertainment and
 dining experience, including live jazz performances. Limited narrative
 constituting an incidental amenity would not subject said Boats to the Tour
 Tax. In addition the Tour Tax is not applicable to non-gaming Mississippi
 River cruise boats, the primary purpose of which is to merely transport
 passengers from one point to another along the river.
 Honorable Ralph Brennan, President
 Ernest N. Morial New Orleans Exhibition
 Hall Authority
 900 Convention Center Boulevard
 New Orleans, LA 70130

Dear Mr. Brennan:
You have requested an opinion of the Attorney General on behalf of the Board of Commissioners (Board) of the Ernest N. Morial New Orleans Exhibition Hall Authority (Authority). Your question concerns the applicability of a $1.00 per capita tax on the sale of tickets in Orleans Parish for sight-seeing tours (Tour Tax).
You specifically ask whether the legislative act and local ordinance imposing the Tour Tax can be interpreted so as to exclude Mississippi River non-gaming cruise boats (Boats). The Boats, in question, fall into two categories:
 (1) Boats that primarily offer an entertainment and dining experience, including luncheon, dinner, beverage service and live jazz performances. There are no tour guides or lecturers, although there is some narrative, constituting an incidental amenity.
 (2) Boats which are used merely to transport passengers from one place to another along the Mississippi River, with some incidental narrative.
We believe a brief discussion of the circumstances leading up to the adoption of the Tour Tax is necessary and relevant to the resolution of the issue before us.
The Authority was created pursuant to Act No. 305 of the 1978 Regular Session of the Louisiana Legislature (Act 305), as a political subdivision of the State. Its governing body consists of seven appointed Board members. The Authority was *Page 14 
established to acquire, construct, improve, maintain and operate convention, exhibition, and tourist facilities in order to promote economic growth for the City of New Orleans (City).
To accomplish these purposes, Section 6 of Act 305 authorizes the Authority to levy and collect a one percent hotel occupancy tax, upon favorable resolution of the Board and approval by the New Orleans City Council and a majority of the electors of the City. This tax was approved and is currently being collected.
Prior to the 1994 Legislative Session, the Board explored options for additional tax revenues to help finance the PhaseIII Expansion of the Ernest N. Morial Convention Center — NewOrleans (Center). It appointed a Tour Tax Committee (Committee), consisting of Board members and representatives of the tourism industry. The Committee conducted a study and made recommendations for proposed additional taxes to the Board for consideration by the State Legislature. Among these recommendations were an additional hotel occupancy tax and the Tour Tax, in question.
Based on these findings and recommendations, the Louisiana Legislature enacted Act No. 42 of 1994 (Act 42) which amended Act 305, adding thereto, Section 20.2. The amendment authorized the Authority to impose the Tour Tax. Pursuant to Act 42, the Authority adopted Tour Tax Ordinance No. 2 (Ordinance). The Ordinance tracks the language in Act 42 and provides, in pertinent part, as follows:
 SECTION 1. As used in this ordinance, the following terms, words and phrases have the meaning ascribed to them in this Section of this ordinance, except when the context clearly indicates a different meaning.
 * * *
 "Per capita sight-seeing tour" means a sight-seeing tour sold to individuals and/or groups of individuals on a cost per person basis.
 "Sight-seeing tour" means a tour of places and things, including but not by way of limitation, points of interest, historic buildings, parks and other sites conducted by persons acting as sight-seeing guides and/or lecturers, and includes walking tours *Page 15 
and those conducted on any type of vehicle or other means of conveyance.
 * * *
 SECTION 2. There is hereby levied from and after January 1, 1995, for the purposes set forth in the Act, the following tax:
 A tax of $1.00 on all tickets sold in the Parish of Orleans for (i) per capita sight-seeing tours in the Parish of Orleans and (ii) tours, a portion of which include sight-seeing in the Parish of Orleans. This tax is to be paid by the purchaser of the ticket to the seller of the ticket at the time of purchase.
Section 4 of the Ordinance further provides that the Tour Tax shall be collected by the Louisiana Department of Revenue and Taxation (Department) pursuant to a Contract of Agency (Contract) between the Department and the Authority. Under the terms of the Contract, the Department is empowered to collect and enforce the payment of the Tour Tax. Accordingly, the subject tax was implemented and has been collected from May of 1995 to present.
As previously noted, the Board appointed a study Committee to identify appropriate tax revenues to finance the Phase IIIExpansion of the Center. Chairing that Committee was William G. Langkopp, Executive Vice-President of the Greater New Orleans Hotel-Motel Association. We have reviewed a letter to you from Mr. Langkopp, dated December 15, 1997. We find the following excerpt to be relevant to the issue at hand:
 The committee set out to identify those components of our industry that reaped financial rewards from business generated by the Convention Center, but were not contributing through the collection of taxes on goods and services provide[d].
 We focused on the tour industry . . . because that part of our industry seemed to be enjoying solid growth and we felt [it] could contribute in some way. Our research revealed that in fact there was no tax on bus tours and walking tours, which surprised us all. We also found out that the excursion boats "touring" the river were paying not only the applicable sales taxes, but also the amusement tax as well. *Page 16 
 With this information we in committee agreed that "tour" boats should not be called upon to assist, but that a $1.00 per head tax on walking and bus tours should be established.
 * * *
 The language used, "conveyance" and "per capita", comes from the city code relative to the regulations of tour buses. At no time was this language ever meant to apply to excursion boats.
Duplicate copies of the above letter of opinion were presented to the seven members of the Board and nine Committee members that either recommended, considered or adopted the Tour Tax. All unequivocally concur in the opinion expressed above that the Tour Tax is not applicable to the Boats. You evidence this by the submission of these duplicate originals signed in counterpart by the above referenced Board and/or Committee members. Consequently, the Tour Tax has never been imposed on, or collected from, the Boats. We turn now to the statutory and case law we believe to be relevant to your inquiry.
The basic tenets of statutory construction and interpretation which apply to Act 42 and the Ordinance are found in the Louisiana Civil Code and Title 1 of the Louisiana Revised Statutes. These tenets are applicable, not only to state statutes, but also to municipal and parochial ordinances.Liberto v. Rapides Parish Police Jury, 667 So.2d 552 (La.App. 3rd Cir. 1995), rehearing denied. Your attention is directed to the following Articles of the Civil Code:
Art. 9. Clear and unambiguous law
 When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature.
 Art. 10. Language susceptible of different meanings
 When the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law. *Page 17 
 Art. 11. Meaning of words
 The words of a law must be given their generally prevailing meaning. Words of art and technical terms must be given their technical meaning when the law involves a technical matter.
 Art. 12. Ambiguous words
 When the words of a law are ambiguous, their meaning must be sought by examining the context in which they occur and the text of the law as a whole.
The following Sections of Title 1 are also applicable:
 § 3. Words and phrases; how construed
 Words and phrases shall be read with their context and shall be construed according to the common and approved usage of the language. Technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning.
 § 4. Unambiguous wording not to be disregarded
 When the wording of a Section is clear and free of ambiguity, the letter of it shall not be disregarded under the pretext of pursuing its spirit.
As previously noted, the Tour Tax is imposed on "per capita sight-seeing tours". By definition, "sight-seeing tour" means "a tour of places and things, including but not by way of limitation, points of interest, historic buildings, parks and other sites conducted by persons acting as sight-seeing guides and/or lecturers, and includes walking tours and those conducted on any type of vehicle or other means of conveyance".
You suggest that cruise boats may not necessarily constitute a "means of conveyance" as that term is used in the Ordinance. We disagree. The phrase *Page 18 
"any vehicle or other means of conveyance", if read within its context, construed according to common and approved usage and given its generally prevailing meaning, is clear and would include boats.
However, we do find the phrase "sight-seeing tour" to be ambiguous. Although there is an attempt to define the phrase in the Ordinance, the definition is unclear. The statutory definition begins "Sight-seeing tour means a tour . . ." which begs the question (i.e., what is the definition of a "tour"?).
It would appear that a guided (i.e., with tour guide or lecturer) excursion through the Cabildo or carriage or bus rides through the streets of the French Quarter with a primary focus on a narrative of the many historic and interesting places therein would constitute "tours". However, a carriage or bus ride taken merely as a means of transportation from one point to another within the French Quarter, without the narrative of a guide or lecturer, would not likely be considered a "tour".
The distinction, we believe, is the primary object of the trip. In other words, if the primary object of the trip, regardless of the means of transportation or conveyance, is the visitation or observation of points of interest (e.g., historic building, parks, churches, cemeteries, planetariums, zoos and/or libraries) and it is accompanied by the narrative of a tour guide or lecturer, the trip would likely be considered a tour subject to the Tour Tax.
By contrast, using a boat as an example, if the primary
object of the cruise is an entertainment and dining experience (e.g., luncheon, dinner, beverage service and live jazz performances), the excursion would not appear to be a tour subject to the imposition of the Tour Tax. The fact that there may be some narration as an incidental amenity would, in our opinion, not convert the cruise into a "tour". The Tour Tax would likewise not apply to a boat, the primary purpose of which is to merely provide transportation from one place to another along the river.
Having found the Tour Tax Ordinance ambiguous with regard to the definition of a "sight-seeing tour", we believe it appropriate to apply the doctrine of contemporaneous construction. The rules of contemporaneous construction have been held applicable to local ordinances. Gautreau v. Board of Elec.Examiners of City of Baton Rouge, 167 So.2d 425 (La.App. 1st Cir. 1964), rehearing denied. Under the doctrine, when a statute or ordinance contains latent ambiguities, despite superficial clarity, the Court may turn to the ordinance's legislative history for guidance. Bourque v. Bailey,643 So.2d 236 (La.App. 3rd Cir. 1994), writ denied. When considering the legislative history, the *Page 19 
reason for, and spirit of, the enactment should be considered so as to fairly secure and attain the ends proposed. Liller v.Louisiana Board of Alcoholic Beverage Control, 59 So.2d 222
(La.App. Orl. Cir. 1954), rehearing denied, and State v. Roberson,72 So.2d 265, 225 La. 74.
Further, a court interpreting legislation under the rules of contemporaneous construction, should consider all of the factual evidence preceding, surrounding and following the enactment of the statute. Deshotels v. State Professional Imp. Committee,430 So.2d 1198 (La.App. 1st Cir. 1983), writ denied.
It is axiomatic that the long settled contemporaneous construction by those charged with administering a statute or ordinance is given substantial or decisive weight in its interpretation, State v. B.P. Exploration and Oil, Inc.,686 So.2d 823 (La. 1997). More specifically, statutes, ordinances and administrative regulations providing for a special tax rate must be strictly construed and, when challenged, the construction consistently given same by the agency charged with applying them is to be given great weight. Secretary of the Department ofRevenue and Taxation v. Texas Gas Exploration Corp.,506 So.2d 528 (La.App. 1st Cir. 1987), writ denied.
As previously discussed, the exploratory Committee appointed to consider additional tax revenues concluded that the Tour Tax was a feasible solution. The Committee and the Board further determined that the Tour Tax should be imposed on those components of the tour industry (e.g., bus and walking tours) that were reaping financial rewards from the Authority without contributing in the form of the collection of taxes on the goods and services they provided. They further determined that the Boats were paying, not only the applicable state and local sales taxes, but also the amusement tax. For these reasons, the consensus of all members was to exclude the Boats from paying the Tour Tax and, to this end, it has never been collected therefrom.
It is clear from the discussions attendant upon the progress of the state legislation (Act 42) and the resulting Ordinance that there was never an intent to impose the Tour Tax on the subject Boats. In this regard, we find compelling the statements submitted by the Board and Committee members that either recommended, considered or adopted the Tour Tax. These statements unequivocally reflect the unanimous opinion of the inapplicability of the Tour Tax to the Boats. While our jurisprudence has held inadmissible the testimony of the intention of an individual legislator, it has recognized as admissible the intent of the legislative body as a whole.Authement v. Davidson 366 So.2d 986 (La.App. 1st Cir. 1978). *Page 20 
Applying the statutory and case law discussed above, it is our opinion that the Board's and/or Authority's interpretation that the Tour Tax is not applicable to the Boats is legally sustainable. Our opinion is limited to the two categories of Boats described hereinabove.
Trusting this adequately responds to your inquiry, I am
Very truly yours,
 RICHARD P. IEYOUB ATTORNEY GENERAL
 By: ____________________ ROBERT E. HARROUN, III Assistant Attorney General
 RPI/Rob3/sfj *Page 21 
 ATTACHMENT OPINION NUMBER 99-307 90-A-2 PUBLIC FUNDS — LOAN, PLEDGE OR GRANTS
 LA. R.S. 9:4201, ET SEQ.; 9 U.S.C.A. SECTIONS 1-14
ARTICLE 7, SECTION 14(A), LOUISIANA CONSTITUTION of 1974
 The New Orleans Public Facility Management, Inc., a public entity, may pay overtime to its employees in compliance with an arbitrator's order without violating Article 7, Section 14(A) of the Louisiana Constitution.
 Mr. Jimmie D. Fore' Executive Vice President Ernest N. Morial New Orleans Exhibition Hall Authority 900 Convention Center Boulevard New Orleans, LA 70130
Dear Mr. Fore:
We received your request and provide you with our opinion on the following issue:
 May the New Orleans Public Facility Management, Inc., in compliance with an arbitrator's order, pay its employees overtime compensation for time that the employees were not "working" without violating Article 7, Section 14 of the Louisiana Constitution of 1974?
As we appreciate the facts presented in your request, the Ernest N. Morial New Orleans Exhibition Hall Authority (hereafter referred to as "the Authority") is a political subdivision of the State of Louisiana. The Authority created the New Orleans Public Facility Management, Inc. (hereafter referred to as "NOPFMI") to manage and operate the Ernest N. Morial Convention Center in New Orleans. The Board of NOPFMI comprises the Board of the Authority. NOPFMI is a non-profit entity and all funds received by it become the funds of the Authority.
NOPFMI has a collective bargaining agreement with the International Brotherhood of Electrical Workers (hereafter referred to as "the Union"). The Union filed a grievance against NOPFMI concerning the work schedule. NOPFMI changed the work schedule from 8:00 am to 4:30 pm with a half hour, unpaid lunch break, to 8:00 am to 5:00 pm with a hour, unpaid lunch break. The grievance was submitted for arbitration, presumably as provided for in the collective bargaining agreement. The arbitrator ordered that the company, NOPFMI, pay its employees the amount of overtime compensation lost as a result of the change in the work schedule. The Authority's concern is that the order directs it to pay its employees for time when they were on their unpaid lunch break, and thereby, violate Louisiana Constitution Article 7, Section 14(A). *Page 22 
Article 7, Section 14(A) prohibits the State or any political subdivision of the State from loaning, pledging, or donating funds, property, or things of value of the State or any political subdivision to or for any person. The Louisiana Supreme Court ruled that Article 7, Section 14(A) is violated whenever the State or one of its political subdivisions seek to give up something of value when it is under no obligation to do so. Cityof Port Allen vs Louisiana Municipal Risk Agency, 439 So.2d 399
(La. 1983). We previously opined that "obligation", as referred to by the court, means that the particular expenditure of public funds is in the discharge of a legal duty. Atty. Gen. Ops. 98-432 and 92-204. The question then becomes whether or not the arbitrator's award is an obligation so that the payment of overtime to the Authority's employees is an expenditure of public funds which is in the discharge of a legal duty.
Collective bargaining agreements are considered "contracts of employment" and are thereby excluded from the Federal Arbitration Act (9 U.S.C.A. Section 1-14) and the Louisiana Binding Arbitration Law (La. R.S. 9:4201, et seq.). While contracts of employment may not be covered under the federal and state arbitration acts, parties can agree to arbitration and a ruling from the arbitrator is binding on the parties. Again, assuming that the collective bargaining agreement between the Union and NOPFMI contained a valid arbitration provision, the arbitrator's award is binding.
Our office has consistently opined that the payment of a bonus or any other gratuitous, unearned payment to public employees is prohibited by Article 7, Section 14(A). Atty. Gen. Op. 95-323. Based on the facts presented, the employees worked 8 hours within a 9 hour workday rather than 8 hours within a 8½ hour workday as provided in the collective bargaining agreement. The arbitrator ordered NOPFMI to restore the prior schedule and pay the amount of overtime compensation due its employees. Thus, the order to pay overtime is based on the finding that NOPFMI was without authority to expand the workday to 9 hours. As such, the Authority is being ordered to pay its employees earned
compensation.
Thus, it is our opinion that the arbitrator's award creates an obligation of the Authority and the expenditure of public funds to its employees would be in the discharge of a legal duty. The payment of overtime compensation in this instance is an earned payment to public employees and therefore is not prohibited by Article 7, Section 14(A). *Page 23 
Trusting this responds to your request, we remain,
 Yours very truly,
 RICHARD P. IEYOUB
 ATTORNEY GENERAL
 BY: _______________________
 TINA VICARI GRANT
 Assistant Attorney General
 TVG:jv